**UNITED STATES of America,**
**Appellee,**

**v.**

**Joseph D'ERCOLE and Marty Russo,**
**Defendant-Appellants.**

**No. 345, Docket 23677.**

United States Court of Appeals
Second Circuit.

Argued June 8, 1955.

Decided Aug. 9, 1955.

---

J. Edward Lumbard, U. S. Atty., for the Southern District of N. Y., for appellee, Gabriel B. Schwartz, Asst. U. S. Atty., Brooklyn, N. Y., of counsel.

Arnold D. Roseman, New York City, for defendant-appellant, Joseph D'Ercole.

Robert Mitchell, New York City, for appellant, Marty Russo.

Before CHASE and MEDINA, Circuit Judges, and RYAN, District Judge.

CHASE, Circuit Judge.

Appellant Russo, who was convicted only on the conspiracy count, relies for reversal principally upon an asserted variance between the allegations in that count, which alleged a single conspiracy in which he and the appellant D'Ercole participated with eight other named co-conspirators and with others unknown, to violate 18 U.S.C. § 2312, and the evidence, which he contends proved not one conspiracy but several.

Three of the alleged co-conspirators, Joseph Turetsky, Richard Gould and Edward Wallace, pleaded guilty before the trial began and testified as witnesses for the government. Because of that there was much testimony from insiders and the evidence as a whole was ample to justify the jury in finding substantially as follows:—

In 1951 Joseph Turetsky and Richard Gould were partners doing business in the Southern District of New York under the trade name G. M. T. Motors, selling new and used automobiles both at retail and at wholesale. In December of that year appellant Russo and his partner Dominick Funaro went to the show room of G. M. T. Motors where they met Turetsky and Gould and then bought an automobile from them. In the following spring, Russo and Funaro sold two automobiles to Turetsky and Gould. These were not stolen cars, but they had paid for one of them in part by trading in a stolen car. In the summer of that year Russo told Turetsky and Gould that his connection with a company which rented cars would enable him to buy late model automobiles at attractive prices and that he would pay G. M. T. Motors a commission for selling them. After that G. M. T. Motors sold some cars for him and Funaro and bought at least three. Some time that fall Turetsky and Gould learned that the automobiles which they had received from Russo and Funaro had been stolen and, after they talked with Russo about that, he made them what he said was a good proposition. He admitted that the cars he and his partner had been selling Turetsky and Gould, and those they had been selling for him, had been stolen and explained how they had had the motor and serial numbers changed by an expert who turned out to be one Nicholas Pugliese. His "good proposition" was that Turetsky and Gould should find an exporter to buy stolen cars which he would deliver with distinguishing marks so altered that when they had been exported it would be difficult, or impossible, to trace them. He later explained to Turetsky and Gould the way in which he and Funaro stole the cars and the steps they took previous to a theft to facilitate the sale of them.

Their method was to pick out the cars they intended to steal and then to make out fake New York registrations for them for two previous years; doing that with aid of a forged New York Motor Vehicle Bureau stamp which they had, and then to prepare on the stationery of some authorized dealer false bills of sale to fictitious persons. They used fictitious serial and motor numbers in making out these papers which they then took to motor vehicle departments in other states where they exchanged them for genuine registrations in the names of the fictitious transferees. After that they stole the cars and had the motor and serial numbers changed to correspond with the numbers in the registrations. Turetsky and Gould agreed to

buy the cars stolen in that way and tried, unsuccessfully for a while, to find someone to buy them for export. Whenever they would buy one of these stolen cars they would make out a check to the order of the "owner" as shown by the out-of-state registration and, after that name had been endorsed on the check, Russo and Funaro would cash it and divide the money with Turetsky and Gould in whatever way they agreed. While the efforts were being made to arrange for the export of the cars, the four men talked over the situation and decided to sell the cars, as occasion occurred, to dealers in states where motor vehicle laws and their method of enforcement made that seem reasonably safe.

Early in January 1953, however, Turetsky and Gould succeeded in making arrangements with an exporting firm, which was unaware that the cars had been stolen, to purchase cars for export and, after explaining such arrangement to Russo and Funaro, began to dispose of the cars in the following way. The exporting firm would give Turetsky and Gould orders for the cars they wanted. They would then turn these orders over to Russo and Funaro who would steal the cars, have the numbers changed and deliver them to Turetsky and Gould.

Appellant D'Ercole, who was an acquaintance of Turetsky and Gould, helped them make the arrangements with the exporting firm, after they had explained to him the way the automobiles were being obtained from Russo and Funaro and had offered to take him into the business on an equal basis with them if he would assist in disposing of the stolen cars. He was introduced to Russo and Funaro and agreed to come in and help.

It was thought best to have D'Ercole take and dispose of stolen cars under a separate trade name which indicated that he was operating a "drive-it-yourself" agency because it would be less suspicious for such a business to have a large number of new cars than it would be for a concern ostensibly dealing in used cars and so he was set up in business under the trade name "United-Drive-Yourself." After that he was an active participant in the scheme.

In going through the formalities in getting ready to engage in business under the "United-Drive-Yourself" name, he at first executed a certificate in his own name which he filed with a bank. But later he thought better of that and withdrew that certificate, replacing it with another he signed with the fictitious name, Joseph Romano. A certificate purporting to have been signed by Romano was also filed in the office of the Bronx County Clerk. A bank account was opened on which the authorized signatures were Joseph Romano (D'Ercole) and Dominick Romano (Turetsky) and after that stolen cars were handled by the conspirators under the "United-Drive-Yourself" name.

About the first week in October 1953, after D'Ercole, Russo and Funaro, and Turetsky and Gould had sold over one hundred stolen cars to dealers in various states in the United States and for export to foreign countries, Turetsky and Gould decided to withdraw from the business and did. In the following November, Turetsky learned that insurance underwriters were making an investigation of the transfer of two of the stolen cars which had been sent to New England and then he and Gould, D'Ercole and Russo had a talk at which it was decided that the records of G. M. T. Motors which related to stolen cars should be destroyed and to a large extent that was done.

Pugliese, who changed the numbers on the stolen cars, was active in the conspiracy and offered to, and did, sell some stolen cars to Turetsky and Gould during the time they were getting stolen cars from Russo and Funaro. This was apparently because he sold them at lower prices. Wallace, an employee of Turetsky and Gould, became one of the conspirators as did Bradley, an automobile dealer in Massachusetts, who, after he had discovered that a car he had purchased was a stolen one, was thereafter

sold stolen cars at prices lower than those he had previously paid.

■ These facts show not several conspiracies as the appellant Russo now argues but an extensive single enterprise in which he was one of the original parties and in which he continued to participate until the authorities caught up with the conspirators and the ring was broken up. They serve to distinguish such cases as Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557, and Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314, on which he, to a large extent, relies. The fact that Turetsky and Gould got out in the fall of 1953 when they knew the jig was about up left the conspiracy operating with Russo and the other members just as before and there is nothing whatever to show that Russo acted affirmatively to withdraw before he was caught. He knew what was being done by the conspirators and helped not only in stealing the cars but in facilitating their transportation in interstate and foreign commerce afterwards. His situation is vastly different from that in United States v. Falcone, 2 Cir., 109 F.2d 579, and is comparable to that in Bartoli v. United States, 4 Cir., 192 F.2d 130. See also, Direct Sales Co. v. United States, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674, and United States v. Bruno, 2 Cir., 105 F.2d 921.

All this applies to appellant D'Ercole with the immaterial distinction that he wasn't one of the original conspirators but joined after the conspiracy was formed with complete knowledge of its illegal purpose and activities. Manton v. United States, 2 Cir., 107 F.2d 834, certiorari denied 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012.

■ We find no substance in the asserted errors during the trial of which the appellants complain. Russo did sign, as "Joseph Romano", the so-called second certificate of doing business under the "United-Drive-Yourself" name which was filed with the bank and in the Bronx County Clerk's office. The fact of his execution of the so-called first certificate, which he signed with his own name and withdrew soon after it had been filed with the bank, was brought out during the cross-examination of the government's witness, Wallace. It was obviously but a collateral matter as to which the cross-examiner had no right to impeach the witness.

■ There is nothing to show that Pugliese was not available as a witness for the appellants if they desired to call him and the request that the court have him called to testify, the government having failed to do so, was addressed to the discretion of the court and the denial of it under such circumstances was not erroneous. United States v. Paccione, 2 Cir., 224 F.2d 801.

■ D'Ercole attempted to explain his connection with the "United-Drive-Yourself" business as a lawful way in which he was trying to secure the payment of a loan of $25,000 he claimed his deceased brother Dominick had made to Turetsky who denied that he had borrowed the money. On the cross-examination of Turetsky by D'Ercole's attorney, he was asked whether an Internal Revenue Agent, in an interview with him had asked him whether he had borrowed $25,000 from Dominick D'Ercole. He answered that the agent had made that inquiry and that he had told the agent that he had not borrowed the money. The agent did not testify and during his summation the assistant district attorney commented that the agent was not called "because Turetsky was telling the truth." There being nothing to show that the agent could not have been called as a witness by the appellant had that been desired, what the prosecutor said did not go beyond the bounds of permissible comment. United States v. Beekman, 2 Cir., 155 F.2d 580.

None of the other points raised merit discussion.

Judgment affirmed.