UNITED STATES of America, Appellee,

v.

Abraham KABOT, Defendant-Appellant.

No. 39, Docket 26965.

United States Court of Appeals Second Circuit.

Argued Sept. 27, 1961.

Decided Nov. 13, 1961.

See, also, 185 F.Supp. 159.

Henry G. Singer, Brooklyn, N. Y. (Maurice Edelbaum, New York City, on the brief), for defendant-appellant.

Edward R. Cunniffe, Jr., Asst. U. S. Atty., So. District of New York, New York City (Robert M. Morgenthau, U. S. Atty., and Arnold N. Enker, Asst. U. S. Atty., So. District of New York, New York City, on the brief), for appellee.

Before LUMBARD, Chief Judge, and FRIENDLY and SMITH, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge.

This is an appeal from concurrent eighteen month sentences for offering and giving a $25,000 bribe to one Keyser, an Internal Revenue Agent, to influence him in an income tax matter. 18 United States Code, Section 201. The judgment is affirmed.

Appellant attacks the conviction on numerous grounds, including the denial of a pre-trial motion to dismiss the indictment for unnecessary delay in filing, the failure to call Gillis, an Internal Revenue Agent, as a witness, refusal to produce statements and grand jury testimony of Gillis and one Sweeney, an investigating agent who died during the trial, the admission in evidence of recordings of Kabot's conversations with Keyser, the exclusion of a recording of a conversation between Keyser and Gillis, instructions to the jury on character evidence and on evidence relating to the merits of the tax case, and refusal of instructions on a theory of enticement. We find no reversible error.

Appellant Abraham Kabot was accountant for Salomon and Bart van Berg, diamond merchants, and their wives and for two New York corporations which they controlled, Van Berg Diamonds, Inc. and Rough Diamond Co., Inc., as well as for other clients, many of whom were also in the diamond business. One Keyser was an agent of the Internal Revenue Service in the International Operations Division, stationed in Washington, D. C. An agent of the Service in Puerto Rico reported that there was a question concerning the withdrawal by Salomon van Berg from a Puerto Rican van Berg corporation, Brilliants, Inc. of $2,000,000 and of allocation of profits and expenses between Brilliants, Inc., and Van Berg Diamonds, Inc., to which Brillants sold virtually all its output. Keyser was thereupon in July 1958 assigned to audit the individual returns of the van Bergs for 1954 through 1957, the corporate returns of Van Berg Diamonds for the same years, and the corporate returns of Rough Diamonds, Inc. for the fiscal years 1955, 1956 and 1957. Keyser telephoned Salomon van Berg for an appointment. Van Berg had Kabot call Keyser back and an appointment was made for September 8. On that date Keyser came to New York, called on Kabot at Kabot's office and explained the two major questions pending. He then went with Kabot to van Berg's office and explained the issues to van Berg.

Keyser on the 8th mentioned to Kabot that he had an acquaintance with one Gillis, an agent in the New York Internal Revenue office. On or about the 9th of September Keyser mentioned to Gillis' superior that he was acquainted with Gillis, who was called in to greet Keyser. Keyser was at van Berg's office conducting the audit on September 9 and 10, returning to Washington September 12. Keyser had arranged to come back to New York September 29. Someone representing himself as Keyser's superior, Moysey, called Kabot and told him rather abruptly that there was too long a delay. The appointment was moved up to September 25. In the latter part of September and in October Keyser was at the van Berg office about a dozen times. At about this time, according to Kabot, Gillis stopped in at Kabot's office and told Kabot that Keyser wanted him to know that he was a pretty good agent and could get very rough. On being asked how Keyser would like it if the conversation were

reported, Gillis was said to have asked Kabot to forget about it; and to have pleaded with Kabot not to say anything to Keyser. Sometime after Gillis had talked with Kabot, Keyser called Gillis and had dinner at Gillis' house. Keyser testified that there was no mention of the case at Gillis' house. On October 27 Gillis was invited to and did accompany Keyser and Kabot to lunch.

About October 9 Keyser had told Kabot and van Berg that he was going to recommend that the $2,000,000 withdrawal be taxed as a dividend to van Berg and that he would work up a figure on the reallocation of profits and expenses between the Puerto Rican and New York corporations. He also mentioned another questioned item of a $300,-000 credit on the books of Van Berg Diamonds. Keyser returned to Washington, coming back to New York on October 27. He informed Kabot that he was recommending that the $2,000,000 withdrawal and $300,000 credit be taxed as dividends resulting in an added individual tax of $1,929,000, and that the corporate tax be increased $460,000 as a result of reallocation of profits and expenses. Kabot asked if the case could be disposed of at Keyser's level. Later, walking back after a visit to van Berg's office, according to Keyser, Kabot said that he apologized for bringing the matter up, but that Gillis said it would be all right to ask if there was anything he could do to make everybody happy and dispose of the case without carrying it to a higher level.

On considering the conversation overnight, on October 28 Keyser decided that Kabot was referring to a bribe, and so informed his Washington office. He was instructed not to lead Kabot on, but that if he was offered a bribe he was to pretend to go along with the scheme. Investigating agents then placed a concealed Minifon recording device on Keyser's person, turning it on before he went into Kabot's office on October 28. Keyser and Kabot talked about the case at some length, for more than an hour. A recording of the conversation was in evidence at the trial and was played for the jury. Kabot was shown Keyser's work sheets. According to Keyser, after considerable discussion of the issues Kabot told Keyser that if he would cooperate he would speak to the van Bergs and maybe make it worth while. The recording reflects mention by Kabot of the van Bergs making it worth while. Later, dropping his voice so that it is inaudible on the recording Kabot told Keyser, according to Keyser's version, that if he could put this through without a dividend and just with some reasonable allocation of expenses he thought he could "get around 25 grand." The recording, after the voices again became audible, bears out Keyser's testimony that Keyser mentioned that he had a family to think of, that there was a risk. Kabot told him not to worry, the risk was his too, they could work it out, to think it over. Keyser said he would. Kabot then said he would get up some figures Keyser could use in his report.

On October 29 or 30 according to Kabot, Gillis reappeared at Kabot's office and told Kabot that Keyser had informed Gillis that Kabot and Keyser had come to a settlement of the case, to which Kabot replied that Keyser had not exactly indicated to Kabot that it was settled, but that he, Kabot, hoped so.

On October 30 Keyser, with a concealed Minifon, took Gillis out for coffee. The recording of this conversation was made available to the defense but excluded from evidence. This episode is discussed below.

Sometime prior to November 13 Kabot telephoned Keyser, told him the figures were ready and arranged to meet November 13. Keyser, again with a concealed Minifon, went to Kabot's office. The recording was later accidentally spoiled. Keyser's version, denied by Kabot, is as follows: Kabot asked whether Keyser had given any thought to their previous conversation. Keyser, on instructions from his superiors, stated that he had returned because Kabot had promised $25,000 if Keyser would revise the reports. Keyser in-

structed Kabot to tell the van Bergs he could make it about $25,000 additional tax for each of the three years. Keyser then returned to his hotel. Kabot later came to Keyser's room, and in a conversation recorded by agents in the next room over microphones and wires planted in Keyser's room, asked the procedures to be used in submitting Keyser's reports. Kabot then said to give him a couple of days to make the necessary arrangements.

On November 17 Keyser telephoned Kabot and arranged to meet November 19. On the morning of the 19th he went to Kabot's office with a concealed Minifon. The recording's audibility is in dispute. According to Keyser he showed Kabot his proposed reports and agreed to a further downward revision, telling Kabot it was based on Kabot's statement that he would get Keyser $25,000. Kabot is claimed by Keyser to have instructed Keyser to go back to the hotel and revise the reports. According to Keyser, Kabot explained that then both would get in a taxi and leave Kabot's office, that Kabot would have the money and give it to Keyser while in the cab, and that Kabot would then leave the cab and Keyser could go on. After lunch together, Keyser returned to Kabot's office for his briefcase, then went back to the hotel to revise the report.

At 3:00 p. m. Keyser was searched by the agents, a concealed Minifon placed on him and put in operation, and he returned to Kabot's office. He showed Kabot some forms and gave him others. In front of Kabot's office the two took a cab. According to Keyser, while riding in the cab, Kabot opened a briefcase and took therefrom a white manila envelope tied with string, which he gave to Keyser. The cab stopped, Kabot got out, and on a signal from Keyser was arrested by agents who had them under surveillance. They also pretended to arrest Keyser. The white envelope had inside it another envelope containing $25,000 in currency. Kabot denied any knowledge of the envelope or money.

Kabot was arraigned before a United States Commissioner November 19, 1958 upon a complaint charging him with violation of 18 U.S.C. § 201 and held to answer in $10,000 bail, which he furnished. The Commissioner's hearing was adjourned about 20 times without opposition from Kabot. Meantime, extensive investigation was carried on to determine if others were involved. Evidence was presented to the January 1960 Grand Jury, which returned an indictment of Kabot on March 8, 1960. Kabot was arraigned on the indictment March 25, 1960, stood mute, a plea of not guilty was entered by direction of the court, and bond was continued in the same amount. On April 14, 1960 appellant filed motions to dismiss, for bill of particulars and for inspection of documents. May 26, 1960 appellant's counsel requested trial adjournment to the first week in October 1960. On June 28, 1960 the motion to dismiss the indictment was denied, and the motions for bill of particulars and for inspection were denied in part and granted in part. On December 28, 1960, new counsel for appellant filed an affidavit requesting an adjournment of trial. On March 8, 1961 trial was begun. Trial was concluded on March 24, 1961, the jury finding Kabot guilty on both counts.

■ Appellant cannot complain of the 16 month period between his arrest November 19, 1958 and his indictment March 8, 1960, or the one year period between indictment and the date of trial, March 8, 1961. He did not waive preliminary hearing. He acquiesced in repeated adjournments for the purpose of further investigation by the government of possible involvement of others and possible mitigating circumstances surrounding his own actions. He did not move before the Commissioner for prompt hearing. After indictment his counsel twice requested adjournment of trial dates. Delay caused by or consented to by a defendant is not unreasonable. The right to a speedy trial is deemed waived if not promptly asserted.

United States v. Lustman, 258 F.2d 475, 478 (2 Cir.1958), cert. denied 358 U.S. 880, 79 S.Ct. 118, 3 L.Ed.2d 109 (1958). There is, moreover, no showing of prejudice to appellant from the delay. The one witness, Sweeney, who died during the course of the trial had been available when appellant had requested adjournments of the trial date. There is no indication that his testimony would in any way have aided appellant.

The prosecution was under no obligation to call Gillis as a witness. It made known to the defense that Gillis was available and that it did not intend to call him. Under the circumstances it was for the defense to call him or not as it chose. Cenedella v. United States, 224 F.2d 778 (1 Cir.1955), cert. denied 350 U.S. 901, 76 S.Ct. 179, 100 L.Ed. 791. Under the circumstances here, where the evidence presented left Gillis' part in the affair obscure, it might have been desirable for the court to call him. Compare United States v. Lutwak, 195 F.2d 748 (7 Cir.1952), aff. Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed.2d 593. Since he was available and could have been called by the defense, however, it was within the discretion of the court not to call him as a court's witness. United States v. D'Ercole, 225 F.2d 611 (2 Cir. 1955); United States v. Paccione, 224 F.2d 801 (2 Cir.1955), cert. denied 350 U.S. 896, 76 S.Ct. 155, 100 L.Ed. 788.

Since neither Gillis nor Sweeney testified, the defense was clearly not entitled to inspection of their grand jury testimony, or to statements and reports they made to the investigators. Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1959), 18 U.S.C. § 3500(a). "This section [subsection (a)] manifests the general statutory aim to restrict the use of such statements to impeachment." Palermo v. United States (1959), 360 U.S. 343, 349, 79 S. Ct. 1217, 1223, 3 L.Ed.2d 1287, rehearing den. 361 U.S. 855, 80 S.Ct. 41, 4 L.Ed.2d 94.

The grounds upon which the Keyser-Gillis recording was sought are unclear on the record. Nevertheless the recording might have been allowed in evidence. Gillis did not testify. Keyser did, and was cross examined as to his conversation with Gillis on the basis of his memoranda of October 30 and December 1, 1958, Defendant's Exhibits B and A, which the court had admitted in evidence. So far as the recording was intelligible, therefore, it might properly have been admitted. This court has listened to the recording. The recording was, however, largely unintelligible due to background noises. It does appear that Keyser asked Gillis for some advice and mentioned that he thought Kabot might have something in mind, and that Gillis replied that it was very possible. Nothing else was sufficiently audible to determine exactly what Gillis meant or whether Gillis was talking about Kabot or his experience with accountants in general. There appeared to be nothing in the meager amount of intelligible conversation at all inconsistent with Exhibit B, which was in evidence and used by appellant's counsel in cross examination of Keyser. Since so small a part of the conversation was intelligible from the recording, and its meaning not clear, it was not error to keep it from the jury. If it be considered error, it appears harmless in the circumstances.

The other recordings, which were admitted in evidence, of conversations between Keyser and Kabot, were important to the government's case, supporting as they did in detail much of Keyser's testimony concerning the offer of the bribe, and the lack of solicitation by Keyser of any offer in the conversations up to that point. The appellant contends that the making and use of the recordings were an unconstitutional search and seizure and a violation of defendant's right to due process of law. Appellant's contention is not valid. Clearly the Supreme Court has held, although over vigorous dissent, that neither the constitutional protection

against unreasonable searches and seizures nor the Communications Act prevent the use of recordings of conversations between government agents and persons suspected of criminal activity, absent any trespass or unauthorized tapping of telephone or telegraph wires. On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952). See The Problem of Electronic Eavesdropping (1961), Joint Committee on Continuing Legal Education of the American Law Institute and the American Bar Association. Neither the planting of the microphones in Keyser's hotel room with his consent, and their use by the agents in the next room, nor the Minifons carried by Keyser amounted to trespass within the definition of the majority in On Lee, or approach the physical invasion of another's dwelling without consent perpetrated with the spike mike whose fruits were excluded in Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 784 (1961). The recordings were properly admitted in evidence.

■ Defendant also contends that the charge was erroneous in telling the jury that there was no issue in the case about enticement, inducement or entrapment. We find it unnecessary to consider the government's argument that the defense, being inconsistent with a denial of all criminal activity, is not available to one relying on such a denial. This question need not be reached because of the absence of sufficient evidence to raise a question of entrapment for the jury; to have charged on entrapment would only have created undesirable confusion.

■ The only testimony in the case as to the origin of the idea of the offer of October 28 is that of Keyser and Kabot. Keyser's testimony puts the first tentative suggestion in Kabot's statement during the walk on October 27, a statement Kabot explains as an innocent reference to clearing up the case in a normal manner at the agent's level. Whichever version the jury believed, there was no suggestion that the idea of bribery was initiated by Keyser. The only

evidence from which any inference of suggestion of a crime could conceivably be drawn would be the equivocal statements of Gillis as reported by Kabot. These seem to us insufficient to base any inference of government effort to incite Kabot to crime. The inferences which may be drawn from the claimed conduct of Gillis in relation to Keyser amount at most to an attempt at extortion from Kabot or van Berg. If the jury were to find that such a crime was in the minds of Gillis or of Gillis and Keyser it would be no defense to Kabot. Entrapment involves the action of overzealous government agents acting for the government inciting an innocent man to crime. Extortion on the other hand is based on conduct by dishonest employees attempting action against the government.

■ The actions of Keyser and the investigating agents after the bribe offer of October 28 was made, were legitimate efforts to apprehend one already embarked on a course of criminal conduct. There is no evidence either from the testimony of the agents or of defense witnesses that after Kabot's apparent suggestion of the bribe was reported by Keyser on October 28 and Keyser was acting under instructions, any pressure was exerted by the government to make Kabot go through with the offer or payment. No suggestion of any kind was made by Keyser, on any version of the evidence, until the actual offer of October 28, and thereafter, while Keyser referred at times to the amount promised, there is nowhere evidence of a desire of Kabot to withdraw from the scheme or of efforts of Keyser to hold him to the proposition against Kabot's wishes. There is here no evidence of entrapment. Lunsford v. United States, 200 F.2d 237 (10 Cir.1952), Marks v. United States, 260 F.2d 377 (10 Cir. 1958), cert. denied 358 U.S. 929, 79 S.Ct. 315, 3 L.Ed.2d 302, United States v. DeMarie, 226 F.2d 783 (7 Cir.1955), Sabbatino v. United States, 298 F. 409 (2 Cir.1924), cert. denied 266 U.S. 602, 45 S.Ct. 90, 69 L.Ed. 462 (1924). " * *

the fact that officers or employees of the government merely afford opportunity or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises." Sorrells v. United States, 287 U.S. 435, 441, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932). Lacking sufficient evidence of entrapment, denial of the requested instruction was not error. United States v. DiDonna, 276 F.2d 956 (2 Cir.1960).

Appellant attacks the charge on character evidence, specifically the following portion thereof: "It may be that those with whom he had come in contact with (sic) previously have been misled and he did not reveal to them his true character." This portion may not be considered alone, however. Taken as a whole,[1] the charge properly places the evidence of good character before the jury to be weighed with all other evidence in the case in determining the guilt or innocence of the defendant. United States v. Crosby, 294 F.2d 928 (2 Cir.1961), slip op. 2681, 2717.

Finally, objection is made to the instruction to the jury to disregard the question of the merits of the tax case. This instruction was entirely proper in light of the need for guiding the jury through a mass of complex testimony. Considering the charge as a whole, there was nothing in it tending to make the jury believe that it could not consider the existence of the tax claim and Kabot's ideas about its seriousness with reference to the issue of Kabot's motivation. There was no request for an affirmative instruction on this point, and no attack is here made on its absence.

The charge warning against religious prejudice was not requested by appellant and might better have been left out. It apparently was given in an excess of caution because of mention of religious holidays in the testimony. We cannot say that it was prejudicial.

The charge emphasized the question before the jury of where the $25,000 in evidence came from. It was a central issue in the case and it was not error to call it to the jury's attention in the charge. We find no reversible error in the charge.

No other issues appear to merit discussion.

The judgment of conviction is affirmed on both counts.

LUMBARD, Chief Judge (concurring).

I concur with everything Judge SMITH says with the exception of his statement that it might have been desirable for the court to have called Gillis as a witness with reference to his obscure part in the case. It seems to me the trial judge exercised good judgment in not following this will-o'-the-wisp and thus emphasizing an extraneous matter which neither party saw fit to explore further or to clarify. The issue was Kabot's guilt; it was not whether Gillis might have been engaging in some questionable activity. The only possible relevance of Gillis' testimony would have been on some theory of extortion, but extortion was never claimed by Kabot and it was never in the case. The trial judge used good judgment in leaving matters as they were, especially as the defense never even requested such action during the trial.

1. "Now, there has been testimony here to the previous good character of the defendant. You should consider such evidence of character together with all the other facts and all the other evidence in the case in determining the guilt or innocence of the defendant. Evidence of good character may in itself create a reasonable doubt where without such evidence no reasonable doubt would have existed. But if on all the evidence you are satisfied beyond a reasonable doubt that the defendant is guilty, a showing that he had previously enjoyed a reputation of good character, does not justify or excuse the offense and you should not acquit a defendant merely because you believe he is a person of good repute. It may be that those with whom he had come into contact with previously have been misled and he did not reveal to them his true character."