**UNITED STATES of America,
Appellee,**

v.

**Winston MASSIAH, Mitchell Anfield,
Leonard Royal Aiken and Icky
Thorn, Appellants.**

No. 186, Docket 27125.

United States Court of Appeals
Second Circuit.

Argued Feb. 8, 1962.

Decided July 27, 1962.

Lumbard, Chief Judge, and Hays,
Circuit Judge, dissented in part.

Robert J. Carluccio, New York City, for Winston Massiah, appellant.

Lewis A. Stern, New York City, for Mitchell Anfield, appellant.

Carson DeWitt Baker and Edward Cherney, New York City, for Leonard Royal Aiken, appellant.

Thorn, appellant, pro se.

Sheldon H. Elsen, Asst. U. S. Atty., Southern Dist. of New York, New York, New York City (Robert M. Morgenthau, U. S. Atty., James G. Starkey, David Klingsberg, Peter K. Leisure and Arnold N. Enker, Asst. U. S. Attys., on the brief), for appellee.

Before LUMBARD, Chief Judge, and WATERMAN and HAYS, Circuit Judges.

LUMBARD, Chief Judge.

Winston Massiah, Mitchell Anfield, Leonard Royal Aiken and Icky Thorn appeal from their convictions, after an eleven-day trial before a jury in the District Court for the Southern District of New York, for conspiracy to import cocaine into the United States in violation of 21 U.S.C.A. §§ 173 and 174. Massiah also appeals from his conviction on three related charges: unlawful possession of cocaine on May 6, 1958 on the S.S. Santa Maria, a United States vessel engaged on a foreign voyage, in violation of 21 U.S.C.A. § 184a, unlawful concealment of the same cocaine in violation of 21 U.S.C.A. §§ 173 and 174, and possession, on the same occasion, of cocaine not having come from an original stamped package, in violation of 26 U.S.C. §§ 4701, 4703, 4704(a), 4771(a) and 7237(a).[1]

These appeals present two major questions. The first is whether it was proper to receive in evidence testimony by a federal officer concerning conversations of Massiah and Anfield which each held separately with a co-defendant, Jesse Colson, in Colson's automobile. With Colson's cooperation, a portable transmitter had been secreted in the automobile. Both Massiah and Anfield claim that it was unlawful thus to eavesdrop on

---

1. Massiah was sentenced to nine years' imprisonment on each of the counts against him, the sentences to run concurrently. Anfield and Thorn were each sentenced to nine years' imprisonment on the conspiracy count, and Aiken, a second offender, to thirteen years' imprisonment.

the conversations, and Massiah further claims that the procedure was illegal because he was already indicted (under an indictment returned prior to that on which he was tried, but which was concerned with the same subject matter) and had retained counsel, and therefore could not legally be approached by persons acting on behalf of the government in the absence of his counsel. The second major question is whether the trial judge inadequately charged concerning the necessity, under 21 U.S.C.A. §§ 173 and 174, that the conspirators had had knowledge of illegal importation.

Judge WATERMAN and I are in agreement that the eavesdrop evidence was admissible against both Massiah and Anfield, while Judge HAYS considers it inadmissible against Massiah. Thus we affirm Massiah's conviction on the substantive counts, with Judge HAYS dissenting. Since Judge WATERMAN agrees with Judge HAYS' view, stated in his separate opinion, that the charge on the conspiracy counts was inadequate, the convictions of Anfield, Aiken and Thorn and Massiah's conspiracy conviction are reversed and remanded for a new trial. I dissent from this disposition of the conspiracy counts for the reasons stated in part II of this opinion and vote to affirm all the convictions.

We briefly summarize the evidence which was given by several participants in the conspiracy and those who dealt with the conspirators.

Massiah, Colson and Anfield were seamen on ships of the Grace Line, and commencing in 1956 they obtained cocaine from one Rene Huasaff in Varparaiso, Chile, took it aboard a Grace Line ship to the United States and caused it to be brought ashore by longshoremen when the ships had docked in the Hudson River at New York. Aiken and Thorn purchased large quantities of the cocaine from the importer-defendants and distributed it in New York. There was evidence of at least twelve importations and seven purchases between 1956 and 1959.

The importer-defendants would often arrange to have a longshoreman pick up the cocaine on the vessel, take it ashore, and later meet them at an appointed rendezvous. Longshoreman James Barber testified that he had thus assisted Massiah and Colson after their arrival at New York on a number of occasions in 1956. Massiah's landlady, Elita Lloyd, testified that at about this time he had told her he was dealing in "coke." In 1958 Colson arranged to have a fellow seaman, Paul King, bring in "paint solids" which turned out to be cocaine. The appellant Thorn waited with Colson while King went back on the ship and returned with the "paint solids" which Colson then told him were narcotics.

In April 1958 customs agents were informed by Francisco Torres, a seaman who testified that he had bought cocaine from Jesse Colson on several occasions in 1957 and had been offered cocaine by Massiah, that a shipment of cocaine was due to arrive in New York on the S.S. Santa Maria on May 6 or 7. Customs agents boarded the ship when it docked and found in the aft peak five packages containing over three and one-half pounds of cocaine. In Massiah's locker Agent Cozzi found tape exactly similar to that with which the packages were wrapped and a textile technologist testified that the torn end of the roll found in Massiah's locker matched the end of the tape with which the cocaine had been wrapped.

After Massiah's arrest, Colson telephoned Chile and arranged to have two Chilean women deliver cocaine to his home in the Bronx. There were two shipments and the bulk of both was sold to Aiken. Thorn also purchased some of this cocaine.

### I. *Massiah's Conviction on the Substantive Counts— The Eavesdropping Incident*

Three weeks after his arrest on the Santa Maria, Massiah was indicted on May 28, 1958 and charged with violation of 21 U.S.C.A. § 184a for possessing

three pounds eight ounces of cocaine on board a United States vessel. On July 20, 1959, Massiah was again indicted together with Jesse Colson and one Rene Huasaff on a charge of conspiracy to violate the narcotic laws in violation of 21 U.S.C.A. §§ 174 and 184a. Colson was thereupon arrested and a few days later he decided to cooperate with the government.

At 9:30 on the evening of November 19, 1959, Massiah got into Colson's Chrysler automobile which was then parked on West 146 Street between Seventh and Eighth Avenues. Prior to Massiah's meeting with Colson, Agent Murphy with Colson's consent had placed under the front seat of Colson's car a Schmidt portable transmitter which enabled him to hear the conversation through earphones while seated in another car.

Judge Wright, overruling numerous objections to the admission of the conversation, limited Agent Murphy's testimony to what Massiah said and excluded Colson's part in the conversation. The judge also instructed the jury to consider the evidence only as to Massiah. Agent Murphy testified that in the course of the conversation Massiah told Colson that in late April 1958, while at the home of Rene Huasaff, in Valparaiso, Chile, he wrote a letter to New York and stated the amount of cocaine he was bringing in; he had the cocaine in a suitcase in his room aboard ship for twenty-two days and, when he noticed two days out of New York that the cocaine was evaporating he got the roll of tape and attempted to make it airtight to prevent further wastage. He said it was this tape which got him into trouble. Massiah also told Colson that upon arrival he met a longshoreman and motioned him through the passageway to show him where the cocaine was, but then noticed two men following him and told the longshoreman to come back later. Massiah also told Colson that he knew that information had been given the authorities by Frank Torres and also by a woman named May with whom he had had some dealings.

The indictment on which the appellants were tried was filed on March 3, 1961. In addition to Massiah, Colson and Huasaff, it named the appellants Anfield, Thorn and Aiken and seven others, and it listed fourteen co-conspirators. Obviously the Schmidt transmitter evidence was part of a continuing investigation which bore sufficient fruit to result in the broader charges against many more defendants. As the trial judge permitted the jury to hear only limited parts of this evidence, we cannot know in what other ways it may have assisted the government investigation.

■ Although Colson had pleaded guilty to several counts of the indictment, he did not testify against the other defendants at this trial.[2] The defendants called no witnesses and none of them took the stand. There was ample evidence to support the convictions of all four appellants.

■ Massiah's counsel at trial made four ojections to Agent Murphy's testimony, but of these he pressed only one on appeal, that use of the hidden device constituted unlawful eavesdropping. To support our rejection of this claim, we need do no more than refer to the discussion of a similar contention in our recent decision in United States v. Kabot, 295 F.2d 848, 853–854 (2 Cir. 1961), cert. denied, 369 U.S. 803, 82 S.Ct. 641, 7 L.Ed.2d 550 (1962).

■ On appeal Massiah raises a contention not made at trial, that since he was already under indictment at the time and represented by counsel it was a

---

2. At an earlier trial of these appellants, when Colson took the stand he told the court that he could not testify because his family had been threatened. Counsel for the defendants moved for a mistrial and on the following morning Judge Wright granted the motion for mistrial and commenced a retrial of the defendants on the next day before a new jury. Apparently the government chose not to call Colson as a witness because of his outburst at the first trial.

denial of his rights for any government representative to procure and listen to his conversation with Colson unless his lawyer was present. We do not agree.

The government had the duty to continue its investigation of the possible criminal activities of those suspected of crime even though they might be under charges or indictment at the time. Massiah acquired no immunity from the government's procuring and use of additional evidence merely by reason of having retained an attorney.[3] Indeed the public interest would clearly seem to require the continuance of such investigations so that all involved may be prosecuted. Massiah was enlarged on bail. Whatever he said or did, if it constituted an admission of the pending charges, would be relevant and admissible in evidence against him, provided of course the admission or action was voluntary. If a spontaneous conversation with Colson had been overheard by someone nearby there would be no question of its admissibility. It makes no difference that Colson was acting on the suggestion of Agent Murphy in inducing Massiah to enter the Chrysler and talk about the case. It is not disputed that Massiah entered the car of his own free choice and that he was equally free to speak about the case or to say nothing. It would needlessly hamper investigations of government agents if they were not able to make such contact with those under charges of crime as Agent Murphy made here through the co-defendant Colson. Many criminal cases are solved by such means.

We find no conflict between this view and the ethical precept that forbids direct communication between an attorney and another party represented by counsel, A. B. A. Canons of Ethics, Canon 9. Assuming without deciding that it would be improper for a prosecutor to interview a criminal defendant under indictment in the absence of his retained counsel, see Drinker, Professional Ethics 202 (1953), such a prohibition would not require that government investigatory agencies also refrain from any contact with a criminal defendant not in custody simply because he had retained counsel. To be sure, such a rule would prohibit an investigator's acting as the prosecuting attorney's alter ego, but there is no suggestion that Agent Murphy was so acting here. Moreover, the contact here was at still one further remove—with a co-defendant whose instructions from the investigator were apparently no more than to induce Massiah to talk. This was not a case where a defendant was in danger of being tricked by a lawyer's artfully contrived questions into giving his case away.

No case has been cited to us which supports the rule urged here by appellants. Spano v. New York, 360 U.S. 315, 79 S. Ct. 1202, 3 L.Ed.2d 1265 (1959) is not in point as the Supreme Court found that the defendant's confession had been produced by coercion. Spano was under indictment for murder and had been surrendered by his counsel who had instructed him to answer no questions. Despite this, an assistant district attorney and numerous detectives questioned him in prison for eight hours and obtained a confession. The Supreme Court found that Spano's will "was overborne by official pressure, fatigue and sympathy falsely aroused" and that the confession was coerced. Clearly Massiah's talk in Colson's car was not coerced in the slightest degree. There was no reason to believe that he was not speaking freely and without restraint of any kind.

Nor is People v. Di Biasi, 7 N.Y.2d 544, 200 N.Y.S.2d 21, 166 N.E.2d 825 (1960) in point as there too the defendant was in custody, and without his counsel, during his interrogation by an assistant district attorney after his indictment for a capital offense.

---

3. The record does not show when counsel first appeared for Massiah. But as the government argues on the assumption that Massiah was represented by counsel on November 19, 1959, and that the government knew this, we treat this as being the fact.

We see no reason why narcotics agents should not secure evidence by such deception as was played on Massiah in this case. Those who are engaged in the difficult and dangerous business of investigating illegal dealings in narcotics should not be deprived of any reasonable means of securing evidence. The Narcotic Control Act of 1956 is striking evidence of Congressional concern over this problem. That Act, 70 Stat. 567, 18 U.S.C. § 1405, 26 U.S.C. § 7607, gave increased powers of search and arrest to government agents investigating violations of the customs and narcotics laws; it gave prosecutors the means of giving immunity and compelling testimony, and it greatly increased the minimum and maximum punishments for violations of these laws. See also House Report No. 2388 and Conference Report No. 2546 accompanying H.R. 11619, 84th Cong. Second Session (1956), 1956 U.S.Code Cong. & Admin. News, pp. 3274–3322.

Massiah makes other claims of error which require but brief reference, if any.

■ He complains of the search of the Santa Maria and his locker by the customs agents. 19 U.S.C.A. §§ 482 and 1581 have long authorized such searches of incoming vessels. We said in Landau v. United States Attorney, 82 F.2d 285, 286 (2 Cir. 1936): "The search which customs agents are authorized to conduct upon entry is of the broadest possible character and any evidence received might be used."

■ The trial judge's action in admitting into evidence on the substantive counts against Massiah the tape found in his locker and the tape wrapped around the cocaine package was entirely proper. It had already been received on the conspiracy count. There is no showing that this ruling at the end of the government's case in any way prejudiced Massiah and no such claim was ever made. After this the defendants immediately rested without calling any witnesses.

## II. *The Conspiracy Counts*

■ Although numerous errors are alleged with respect to the conspiracy convictions, the only important point is the claim that Judge Wright did not make it clear in his charge that it was necessary for the jury to find that the conspirators either had knowledge that the drugs in question had been illegally imported or else had such "possession" of the drugs as would under the terms of § 174 raise the presumption of such knowledge. We hold that the other miscellaneous claims of error are without merit,[4] but my brethren feel that the

---

4. Aiken complains that the trial judge did not sufficiently explain to the jury the issues with respect to his identity. We do not agree. The indictment named in Count I "John Doe, a/k/a 'Leon,'" meaning thereby to describe a Negro male of medium complexion, with black hair and a medium build, approximately 40 years old, approximately 5′ 9″ tall and weighing approximately 165 lbs. * * *" One Leon Ellis testified at considerable length regarding the appellant. He identified the appellant Leonard Royal Aiken as the "Leon" for whom he carried packages of cocaine and to whom Jesse Colson sold large quantities of cocaine on numerous occasions. Although Aiken had been arrested as "John Doe, also known as Leon" on a warrant dated May 13, 1961, he did not raise the question of his identity before trial. Judge Wright charged the jury that they must first determine whether the defendants on trial were the defendants named in the indictment. There was no error in his refusal to charge that "If the jury finds * * * that the evidence equally points to the possibility that the defendant named as Leon in the indictment might be Leon known as Schoolboy Ellis, or Leonard Royal Aiken, they must acquit." As the judge had also charged that the jury must find each defendant on trial guilty beyond a reasonable doubt this was all that Aiken was entitled to. There had been no confusion in the evidence.

The appellant Aiken also claims error in the admission against him of testimony by Agent Murphy that after Aiken had been arraigned by Agent Murphy on May 13, 1961, Aiken said to Murphy "If you get any stuff you want to get rid of, call me, you can trust me." It was not error to receive evidence which the jury could consider as an admission by the defendant that he was willing to deal and had been

charge was insufficient. Accordingly, the conspiracy convictions are reversed and remanded for the reasons stated in Judge HAYS' opinion. The following views are my own in dissent.

None of the appellants took any exception to the charge on the grounds asserted here, and in any event I would hold that there is no prejudicial error if the charge is read as a whole.

Although the judge erroneously said that the conspiracy was charged under the general federal conspiracy statute, 18 U.S.C. § 371, rather than the conspiracy clause of 21 U.S.C.A. § 174, the error made no significant difference, since all the relevant elements of a conspiracy to violate §§ 173 and 174 were properly set forth.[5] I cannot believe that the jury would not have understood the charge with respect to the necessity of knowledge of importation and the presumption following from possession. The judge read the essential language of the first sentence of § 174, as follows:

"Whoever fraudulently or knowingly imports or brings any narcotic drug into the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment or sale of such narcotic drug after importation, *knowing the same to have been imported illegally*, or conspires to commit any such action in violation of the laws of the United States, shall be punished." (Emphasis added.)

This language is not difficult for a layman to understand, and, given the evidence in the case, which dealt with an importation conspiracy, it would not have been unreasonable for the jury to conclude that the participants knew the importation to be illegal. And in his explanation of the concept of conspiracy, Judge Wright re-emphasized the need to find that each defendant "knowingly and wilfully participated in the unlawful plan with the intent to advance and further some object or purpose of the conspiracy," and had the "specific intent to do some act which the law forbids."

Since it is harder for the government to show knowledge of illegal importation than to show the possession required to raise the presumption, the appellants cannot complain of a failure to charge concerning the presumption. Such failure to charge would, given the language alluded to above, have held the government to a higher rather than a lower standard of proof; the jury would, then, have found actual knowledge. Moreover, I think that from hearing the charge as a whole the jury was aware of the existence of the presumption and its relevance to the conspiracy count. Before Judge Wright charged concerning the conspiracy count, he had given instructions on

dealing in narcotics. United States v. Picarelli, 148 F.2d 997 (2 Cir.), cert. denied, 326 U.S. 722, 66 S.Ct. 27, 90 L.Ed. 427 (1945); 4 Wigmore, Evidence, § 1061 (8) (3d ed. 1940). The judge instructed the jury to consider this only as to Aiken, just as he instructed the jury that Massiah's statements to the customs agents on May 6, 1958 were to be limited to Massiah. In these rulings there was no error as to the other defendants on trial.

We find no error in the claim of the appellants that the indictment did not adequately inform them of the charges. No motion was made with respect to the indictment or for any bill of particulars, nor is there any showing as to how any claimed defect may have prejudiced the appellants.

Anfield claims that it was error for the judge to admit into evidence testimony by Agent Murphy as to a conversation he had in Colson's car on December 5, 1959, which Murphy overheard by means of the Schmidt transmitter. We hold that this was proper evidence for the reasons stated in the discussion of Massiah's substantive case.

None of the other errors alleged are sufficiently substantial to require discussion.

5. The only real difference between conspiracy under 21 U.S.C.A. §§ 173 and 174 and a conspiracy under 18 U.S.C. § 371 is that the former section carries much heavier penalties and additional penalties for multiple offenders. Thus these are matters affecting sentence only. The indictment which was sent to the jury during its deliberations plainly charged conspiracy in violation of 21 U.S.C.A. §§ 173 and 174.

the various substantive counts against Massiah, one of which charged violation of §§ 173 and 174. On that count, he had read the pertinent parts of the statute to the jury and had given a full explanation of the statutory presumption. When, no more than a few minutes later, he again read the same language of the statute in his instructions on the conspiracy count, he said, "You will note that the conspiracy charges in count 8 relate also to the same substantive offense which is the basis of count 2." I doubt that the jury would so soon have forgotten the explanation of the presumption of knowledge of illegal importation given earlier, or would have been unable to see its relevance to the conspiracy count. While the whole problem of knowledge of illegal importation might have been more explicitly laid out in the conspiracy charge, and it would have been appropriate for the trial judge to clarify the matter had he been requested to do so, I find no prejudice in the charge as given.

As stated above in the summary of the evidence, there was testimony that Massiah and Anfield had themselves imported cocaine and that Thorn was present when cocaine was removed from shipboard. There was evidence that all four appellants had had actual possession of cocaine. In such a case we ought not to magnify our own preferences as to particular language in the charge out of all proportion to the possibilities of misunderstanding and find reversible error, especially when none of the defense counsel made any objection to the charge. Any errors in Judge Wright's charge were harmless and we should disregard them, as Rule 52(a) of the Federal Rules of Criminal Procedure requires us to do. The majority view gets us pretty close to the proposition that a new trial may be had in criminal cases unless the judge's charge is letter perfect even though defense counsel at the time were perfectly satisfied with it and made no suggestions. I would affirm the conspiracy convictions.

Massiah's substantive convictions are affirmed, and the conspiracy convictions of all four appellants are reversed and remanded for a new trial.

WATERMAN, Circuit Judge.

As my colleagues have stated in their respective opinions, I concur with Judge HAYS in reversing the convictions of all of the appellants on the conspiracy count, and I concur with Chief Judge LUMBARD in affirming the conviction of appellant Massiah on each of the substantive counts.

HAYS, Circuit Judge.

Judge WATERMAN and I agree that the conspiracy convictions of all the appellants must be reversed because of the failure of the trial court adequately to charge all the elements of the offense. I would, in addition, reverse all four convictions of the appellant Winston Massiah because the admissions upon which the prosecutions were, in part, based were erroneously admitted in evidence at trial, and on this point I dissent from the views of Chief Judge LUMBARD and Judge WATERMAN.

The appellants, along with several others not defendants in the trial below, were indicted for conspiracy to violate sections 173 and 174 of Title 21 United States Code Annotated. In addition Winston Massiah was charged under the same indictment, with three substantive counts relating to narcotics violations under 21 U.S.C.A. § 184a (unlawful possession of a narcotic drug on board a United States vessel), 21 U.S.C.A. §§ 173, 174, and 26 U.S.C. §§ 4701, 4703, 4704(a), 4771(a) and 7237(a) (possession and dealing in narcotics not in original stamped packages).

In his charge to the jury, the trial judge first dealt with the substantive charges against Massiah. In each case he discussed the crime generally and then listed with great clarity and precision the elements that must be found in order to convict, thus unquestionably leaving with the jurors the impression that these listed elements should be the focus of

their consideration. When the trial judge reached the conspiracy charges, he erroneously stated that the conspiracy was charged under the general conspiracy statute, 18 U.S.C. § 371, rather than the conspiracy clauses of 21 U.S.C.A. § 174. While this misconception was not in itself prejudicial, it is the source and the explanation of the errors that followed.[1] The trial judge went on to state that the conspiracy alleged in the indictment was a conspiracy to violate sections 173 and 174 of Title 21, and to read the pertinent portions of the statute to the jury. Continuing under his misconception that the conspiracy was charged under the general conspiracy statute the judge then discussed extensively the general rules of the law of conspiracy. In conclusion, he summarized the elements which the jury would have to find as follows:

"In order to establish the offense of conspiracy charged in this indictment the evidence must show beyond a reasonable doubt, first, that the conspiracy described was formed and existed at or about the time alleged. Second, that the accused knowingly and wilfully became members of the conspiracy. Third, that one of the conspirators thereafter knowingly committed at least one of the overt acts charged in the indictment on or about the time alleged, at the time and place alleged. And fourth, that such overt act was committed in furtherance of some object or purpose of the conspiracy as charged."

The trial judge failed *at any point* in his charge on the conspiracy count to instruct the jury that knowledge of illegal importation was a necessary element of the conspiracy. And, in addition to what must have been taken by the jury to be an all-inclusive listing of the necessary elements of the crime charged, other statements in the court's general discussion of the law of conspiracy suggested to the jury that knowledge of importation was not necessary:

"One may become a member of a conspiracy *without full knowledge of all the details of the conspiracy or of all of the conspirators.*

"To participate knowingly and wilfully means to participate voluntarily and understandably and with specific intent to do some act which the law forbids, or with specific intent to fail to do some act which the law requires to be done; that is to say, to participate with bad purpose either to do bad or to disregard the law. So if a defendant or any other person with understanding of the unlawful character of a plan intentionally encourages, assists, advises, for the purpose of furthering the undertaking or scheme, he thereby becomes a knowing and wilful participant in the scheme, a conspirator." (Emphasis supplied.)

Thus, the court charged under the wrong statute (18 U.S.C. § 371) and in so doing omitted to charge, indeed rejected the idea, that the jury must find that the drugs were imported to the knowledge of each defendant in violation of law. Judge WATERMAN and I find no justification in law or logic for the assertion that this charge was saved by the court's earlier recital of section 173 or by the proper charge on the count charging Massiah with a substantive violation of sections 173 and 174 of Title 21. In view of the charge as a whole, in which the essential elements of each offense were carefully enumerated for the jury, it must be assumed that the jury relied on the court's listing of the ele-

---

1. An additional indication of the trial court's misconception, although again not in itself prejudicial for the reasons stated in Chief Judge LUMBARD'S opinion, was the failure of the court to mention the presumption arising from possession. It is, of course, irrelevant that the jury must have found possession, in at least some instances, because knowledge of importation is not automatically presumed as a matter of law from possession, but is an inference that the jury is *permitted* to make. United States v. Mont, 306 F.2d 412 (2d Cir. 1962).

ments, and did not consider additional elements provided by their own interpretation of the elements involved in a conspiracy violation of section 174, a question so complex that it has recently evenly divided this court. United States v. Santore, 290 F.2d 74 (2d Cir. 1960) (*in banc*). Considering the charge as a whole, Judge WATERMAN and I are convinced that the jury could not have had the slightest idea that they must find knowledge of importation in order to convict under the conspiracy count.

 In a criminal case, the defendant is entitled to have the jury instructed on all the elements that must be proved to establish the crime charged. United States v. Gillilan, 288 F.2d 796 (2d Cir.), cert. denied, Apex Distributing Co. v. United States, 368 U.S. 821, 82 S.Ct. 38, 7 L.Ed.2d 26 (1961); Kelley v. United States, 107 U.S.App.D.C. 122, 275 F.2d 10 (1960).

 In the present case, the appellants raised no objection to the charge as given, see Rule 30, Federal Rules of Criminal Procedure, but the omission to charge an element of the offense is "plain error," see Rule 52(b), requiring reversal even if the point was not raised below. Screws v. United States, 325 U.S. 91, 107, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); United States v. Levy, 153 F.2d 995, 998–99 (3d Cir. 1946); Williams v. United States, 76 U.S.App.D.C. 299, 131 F.2d 21 (1942). "In a criminal case a court should instruct on all essential questions of law involved in the case, whether requested or not." Kreiner v. United States, 11 F.2d 722, 731 (2d Cir.), cert. denied, 271 U.S. 688, 46 S.Ct. 639, 70 L.Ed. 1152 (1926); see Morris v. United States, 156 F.2d 525, 527, 169 A.L.R. 305 (9th Cir. 1946). In United States v. Noble,

155 F.2d 315 (1946), the Third Circuit stated the governing considerations:

"We think it is self evident that a jury cannot perform its duty of determining the guilt or innocence of a defendant accused of a crime unless they know the essential elements of the crime which he is alleged to have committed. We think it equally self evident that the only appropriate source of that knowledge is the trial judge, whose traditional function has always included that of instructing the jury upon the law. It was because of the failure of the trial judge to give this necessary guidance to the jury that we recently reversed the judgment of conviction in United States v. Levy, 3 Cir., 1946, 153 F.2d 995. We deemed the error so fundamental that we took note of it even though the defendant had not requested the instructions." 155 F.2d at 316–17.

"[W]here the error is so fundamental as not to submit to the jury the essential ingredients of the * * * offense * * * it is necessary to take note of it on our own motion." Screws v. United States, supra, 325 U.S. at 107, 65 S.Ct. at 1038.

Although there concededly was sufficient evidence in this case from which the jury could find or presume knowledge of illegal importation, this provides no ground for assuming that it would have done so had the issue been presented to it.

As Judge WATERMAN concurs in this portion of my opinion, the conspiracy convictions are reversed.

On July 20, 1959, sometime after his arrest, appellant Massiah was indicted with Jesse Colson on three counts, charging substantive and conspiracy violations of 21 U.S.C.A. § 184a and conspiracy in violation of 21 U.S.C.A. §§ 173, 174.[2]

---

2. It is of no moment, as far as the admission of Massiah's statements is concerned, that the indictment under which Massiah was charged in July, 1959 was superseded by a broader indictment, including additional counts against Massiah and additional defendants, that was made possible in part by the information surreptitiously obtained from Massiah.

On July 22, having previously retained counsel, Massiah, along with Colson, pleaded not guilty and was released on bail. Thereafter, without Massiah's knowledge, Colson decided to cooperate with the government. On November 19, 1959 a customs investigator, Finbarr Murphy, placed a transmitter in Colson's car with Colson's knowledge and instructed him to invite Massiah to take a ride with him in the car and to engage Massiah in conversation relating to the alleged crimes. Murphy, who was in another car, was able to pick up this conversation. At trial, he testified to certain admissions that he was able to overhear in this manner. The content of the statements is outlined in Chief Judge LUMBARD'S opinion.

Massiah's counsel objected, without success, to the admission of Murphy's testimony. That contention is renewed on appeal, in part on the ground that, when a defendant under indictment after preliminary examination has retained counsel, direct contact between the government and the defendant violates defendant's right to counsel.

In Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), the Supreme Court reversed a state criminal conviction on the ground that a confession coerced as a matter of law had been received in evidence. Justices Black, Douglas, Brennan and Stewart, concurring, strongly expressed the view that the confession was inadmissible and the conviction should be reversed without regard to the element of coercion because the police interrogated the defendant after his indictment (but before his preliminary examination) in the absence of counsel. 360 U.S. at 324, 326, 79 S.Ct. at 1207, 1209. Although this view was expressed by only four Justices in Spano, the question was left open by the others who voted for reversal on other grounds. Considering that a stricter standard of conduct is imposed by the federal courts on federal law enforcement officials, see

McNabb v. United States, 318 U.S. 332, 340, 63 S.Ct. 608, 87 L.Ed. 819 (1943); Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), it is reasonable to assume that federal officers must deal through and not around an attorney retained by a defendant under indictment.

Since Spano, the New York Court of Appeals has adopted a strict rule rendering inadmissible all statements obtained from an accused after indictment where not made in the presence of counsel, People v. Waterman, 9 N.Y.2d 561, 216 N.Y.S.2d 70, 175 N.E.2d 445 (1961); People v. Di Biasi, 7 N.Y.2d 544, 200 N.Y.S.2d 21, 166 N.E.2d 825 (1960). Indeed, that court has recently extended the rule to include statements made by an accused after arraignment but before indictment. People v. Meyer, 11 N.Y.2d 162, 227 N.Y.S.2d 427, 182 N.E.2d 103 (1962).[3]

"[T]he initiation of a criminal action against the accused by the finding of an indictment operates to impose certain disabilities upon the People. The People would manifestly not be permitted at the trial to call the defendant to the witness stand to establish their case through his testimony. * * * By the same token, they may not circumvent the defendant's privilege against self incrimination by introducing into evidence inculpatory statements obtained from him (following indictment) at a private examination prior to the trial, * * *" People v. Waterman, supra, 9 N.Y.2d at 566, 216 N.Y.S.2d at 75, 175 N.E.2d at 448.

Certainly, if such a rule is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse. In this case, Massiah was more seriously imposed upon than the defendants in any of the cases cited above because he did not even know that he was under interro-

3. In Meyer, the court indicated that the rule applies even when a defendant is informed of his right to have counsel present and makes no request for his attendance.

gation by a government agent. Cf. Spano v. New York, supra, 360 U.S. at 323, 79 S.Ct. at 1207.

The admissions were introduced generally against Massiah on all four counts. Because the statements were inadmissible, I would reverse Massiah's conviction on all counts. It is irrelevant that other substantial evidence of guilt was introduced at trial. It is not for us to speculate on the course the jury would have taken had these damaging admissions not been before them. Spano v. New York, supra, 360 U.S. at 324, 79 S.Ct. at 1207; Payne v. Arkansas, 356 U.S. 560, 568, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958).

I would reverse the substantive convictions of Massiah, as well as all the conspiracy counts, for new trials.