Billy Gale HENRY, Appellant,

v.

UNITED STATES of America, Appellee.

No. 77–2338.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 4, 1978.

Decided Dec. 26, 1978.

---

Jim Moody, Third Year Law Student (Michael E. Geltner and Larry J. Ritchie, Professors, Georgetown University Law Center, Washington, D. C., on brief), for appellant.

Roger T. Williams, Asst. U. S. Atty., Norfolk, Va. (William B. Cummings, U. S. Atty., Alexandria, Va., on brief), for appellee.

Before WINTER, BUTZNER and RUSSELL, Circuit Judges.

WINTER, Circuit Judge:

After an unsuccessful appeal of his conviction for armed bank robbery in violation of 18 U.S.C. §§ 2113(a) and (d), *United States v. Henry*, No. 73–1413 (4 Cir., Sept. 14, 1973) (unpublished), Billy Gale Henry moved to vacate his twenty-five year sentence pursuant to 28 U.S.C. § 2255. Among other grounds for relief, he claimed that, during his confinement after indictment and in the absence of counsel, incriminating statements were obtained from him by a cellmate acting as a government agent.[1] The district court denied the motion, and on appeal the case was remanded for an evidentiary inquiry. *Henry v. United States* (4 Cir. 1977), 551 F.2d 306. Affidavits submitted by the FBI agents in charge of the robbery investigation verified that one of

Henry's cellmates was employed by the government to monitor Henry's statements. The district judge, nevertheless, again denied the motion to vacate. Because we conclude that Henry was denied his right to counsel, we reverse and direct that the motion to vacate be granted and Henry released from custody on the charge unless the government elects to try him anew.

I.

Following his indictment on a charge of armed bank robbery, Henry was incarcerated in the Norfolk City Jail. Shortly thereafter, an FBI agent contacted Edward Nichols who was also an inmate at the Norfolk City Jail and who had been a paid informant of the FBI for over a year. Nichols advised the agent that Nichols was in the same cell block as Henry, as well as other federal prisoners awaiting trial. The agent then told Nichols to be alert to any statements made by these individuals about the charges against them. Nichols was specifically warned not to initiate conversation with or question Henry regarding the bank robbery.

When the agent contacted Nichols again a few weeks later, Nichols reported that Henry had engaged him in conversation, that Henry had talked about the bank robbery charges, and that he had described how the bank robbery had occurred. Nichols was paid by the FBI for furnishing this information.

At Henry's trial, Nichols testified that Henry had admitted going to the bank prior to the robbery to see who opened the vault and he further admitted renting the house indicated on the rental receipt found in the getaway car. According to Nichols, Henry had also described the actual robbery to him. Aside from Nichols' testimony, the case against Henry consisted of: the testimony of another cellmate, Joseph Sadler, as to conversations in which Henry admitted robbing the bank; evidence that Henry,

---

1. The record is not clear as to whether, at the time the statements were obtained, counsel had been retained or appointed or whether the mere right to counsel had attached. The factual uncertainty is unimportant because the government does not dispute that Henry had *not* waived his right to counsel at the time of his conversations with his cellmate.

under an assumed name, rented the house where two of the three robbers, the money stolen, and the masks and clothes used in the robbery were found shortly after the crime; and evidence that Henry, again under an assumed name, ordered a crystal of the same frequency as one used in the police radio scanner found in the house where the two robbers were apprehended.

## II.

The sole issue presented in this case is whether the undisclosed government monitoring of Henry's conversations after his indictment, while he was in custody and had not waived his right to counsel, violated Henry's right to counsel under the sixth amendment. The resolution of this issue depends on the application of the rule established in *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

In *Massiah*, a conversation between Massiah, who had been released on bail, and his co-defendant was recorded by government agents with the co-defendant's consent. During the conversation Massiah made incriminating statements which were later introduced at his trial. The Supreme Court reversed his conviction, holding that Massiah was denied the right to counsel when evidence was admitted "which federal agents had deliberately elicited from him after he had been indicted and in the absence of counsel." 377 U.S. at 206, 84 S.Ct. at 1203. The Court thought it inconsequential that Massiah was not confined at the time, for " 'if such a rule is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse.' " *Id., quoting United States v. Massiah*, 307 F.2d 62, 72 (2 Cir. 1962) (Hays, J., dissenting). There was no finding that any of the co-defendant's actions, aside from his mere presence, had induced the damaging remarks.[2]

Subsequently, several courts held that *Massiah* did not apply to all incriminating statements obtained by government agents after indictment and in the absence of counsel, but only to those statements *induced* by such agents. This refinement was summarily rejected by the Supreme Court in two per curiam opinions, *McLeod v. Ohio*, 381 U.S. 356, 85 S.Ct. 1556, 11 L.Ed.2d 682 (1965), and *Beatty v. United States*, 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed.2d 48 (1967). *McLeod* reversed a state court holding that *Massiah* was not applicable absent questioning or deception. Similarly, *Beatty* overturned the Fifth Circuit's determination that information volunteered to an unknown government informer was admissible despite *Massiah*. The facts of this case would be identical to those in *Beatty* except that Beatty was not in jail at the time of the interception. Because of the restrictive nature of the jailhouse setting, the instant case presents a far more compelling situation for the application of the *Massiah* rule.

The government asserts that *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), limited *Massiah* and its progeny to cases involving "interrogation." In *Brewer*, a police detective enticed the defendant, a former mental patient and deeply religious person, to reveal the location of his victim's body by suggesting to the defendant that a predicted snowfall would preclude the Christian burial of the victim. Equating the "Christian burial speech" with "interrogation," the Supreme Court declared that "the clear rule of *Massiah* is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." 430 U.S. at 401, 97 S.Ct. at 1240. The Court noted, moreover, that there is no constitutional protection where no "interrogation" takes place. *Id.* at 400, 97 S.Ct. 1232.

Notwithstanding the several references to "interrogation" in the *Brewer* opinion, we do not think that *Brewer* limits *Massiah* to cases in which the government has directly questioned the accused about his par-

---

**2.** The opinion of the Court of Appeals, however, indicated that the co-defendant had solicited information about the pending case. *Unit-* *ed States v. Massiah*, 307 F.2d 62, 66 (2 Cir. 1962).

ticipation in crime. In the first place, the Supreme Court cited *McLeod, supra,* with approval, 430 U.S. at 400, 97 S.Ct. 1232, in which *Massiah* was applied even though McLeod was not interrogated by the officers and he knew that they were officers. Secondly, "interrogation" is a relative term, and we agree with the Fifth Circuit in *United States v. Anderson,* 523 F.2d 1192, 1196 (1975), that it is not restricted to formalized oral interrogation. An undisclosed government agent may effectively "interrogate" a defendant by simply engaging the defendant in a general conversation and if the response is a confession of guilt, the agent need not make any further more pointed inquiries. *Miller v. California,* 392 U.S. 616, 88 S.Ct. 2258, 20 L.Ed.2d 1332 (1968) (dissent from dismissal of certiorari).

In the instant case, even if we assume that Nichols obeyed his instructions not to interrogate Henry about the bank robbery, Nichols did testify that he engaged in conversation with his cellmate Henry. If, by association, by general conversation, or both, Henry developed sufficient confidence in Nichols that Henry bared his incriminating secrets to an undisclosed paid informer, we think that there was interrogation within the meaning of *Brewer.* We hold therefore that Henry's right to counsel was violated when the government proved incriminating statements made to his cellmate after his indictment and in the absence of counsel.[3]

### III.

The district court found that, even if Henry's right to counsel was violated, admission of the incriminating statements was harmless error. While other evidence was introduced linking Henry to the robbery, we cannot say beyond a reasonable doubt that Nichols' testimony did not influence the jury's verdict. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

For these reasons, the judgment denying the motion under § 2255 is reversed, and the case is remanded with instructions that the motion be granted and Henry released from the charge against him unless the government elects to try him anew.

REVERSED AND REMANDED.

BUTZNER, Circuit Judge, concurring:

I concur in Judge Winter's opinion. I write briefly, however, to amplify my reasons for concluding that the judgment of the district court must be reversed.

In its opinion, the district court acknowledged the defendant's claim that the government's informant had questioned him in jail about the bank robbery. Nevertheless, the court denied an evidentiary hearing on this issue. Instead, it wrote:

> Here, the Court accepts the statements of the FBI agents that they did not request Nichols [the informant] to question Henry [the defendant] or engage him in conversation, but only to listen to any statements Henry might make within their [sic] hearing and report it to them. Nichols confirms this.

The informant denied questioning the defendant. He did not, however, fully comply with the instructions that he was not to "engage him in conversation, but only to listen." He admitted that he had "some conversations" with the defendant, but he did not divulge what he said to the defendant.

As *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), demonstrates, the informant's conclusory statement that he did not question the defendant is not determinative. The critical issue is whether, after judicial proceedings had been initiated against the defendant, an informant—acting as an agent of the government—elicited information from him in the absence of defense counsel. Proof of

---

**3.** We express no opinion about the interception of prisoners' conversations with non-government agents through electronic listening devices. *See United States v. Hearst,* 563 F.2d 1331 (9 Cir. 1977), *cert.* denied, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978), in which the Ninth Circuit held that such interception did not violate the sixth amendment under *Massiah.*

formal interrogation is unnecessary to invoke the protection of the sixth amendment. A conversation that is tantamount to interrogation is sufficient. 430 U.S. at 397–401, 97 S.Ct. 1232.

It would have been prudent for the district court to have conducted an evidentiary hearing to dispel the ambiguity of the documentary evidence, especially since the government did not reveal the substance of its paid informant's conversation. Nevertheless, absent testimony by the informant about what he said to the defendant, the judgment must be reversed because of the informant's admission that he had conversed with the defendant and because of the defendant's assertion that the conversation was a form of questioning. *See Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).

The district court ruled alternatively that the admission of the informant's testimony was harmless error because the defendant "was clearly identified by eyewitnesses as one of the bank robbers." On this score, the district judge's recollection of the evidence was inaccurate. The defendant was not identified by any witness to the robbery. Indeed, the government's brief acknowledges that its case against the defendant was founded solely on statements of informants and circumstantial evidence. I therefore join in Judge Winter's conclusion that the error was not harmless.

DONALD RUSSELL, Circuit Judge, dissenting:

I respectfully dissent.

The issue in this case is whether the testimony of Nichols, recounting the incriminating information given him by the defendant while the two were prison cellmates, should have been excluded as violative of the defendant's right to counsel under the Sixth Amendment. The majority, relying on *Massiah*[1] for authority, would hold that it should be excluded. I disagree.

As I read *Massiah*, it commands exclusion only when the challenged testimony is the result of "interrogation." And this is indisputably the way the Supreme Court in the recent case of *Brewer v. Williams*[2] read *Massiah*. The prevailing opinion of Justice Stewart in *Brewer* declared "that once adversary proceedings have commenced against an individual, he has a right to legal representation *when the government interrogates him*" but, applying the rule to the facts in *Brewer*, it added that "no such constitutional protection [of the right to counsel] would have come into play if there had been no interrogation." (Italics added)[3] Justice Powell in his concurring opinion (which was necessary to the decision of the Court) was even clearer. He saw the critical issue to be whether there had been interrogation in fact; if there were no interrogation, there would be no constitutional violation and no ground for exclusion.[4] The dissenting opinion agreed with the opinion of Justice Stewart that exclusion of the evidence turned on whether it was the result of "interrogation." Actually, the dispute in the various opinions in the case did not concern whether "interrogation" is a prerequisite for exclusion of incriminating statements by a defendant for a violation of the defendant's Sixth Amendment rights: the dispute centered on whether there had been "interrogation." "Interrogation" is thus established by *Brewer* as the key issue. To paraphrase again Justice Stewart's opinion in that case, "if there [has] been no interrogation," the constitutional right to counsel does "not come into play" or arise.

The majority opinion here appears to recognize that *Brewer* has now established beyond question that the issue in this case turns on whether the testimony in dispute was the result of "interrogation." It dis-

1. 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

2. 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).

3. 430 U.S. at 400–401, 97 S.Ct. at 1240.

4. 430 U.S. at 410, 97 S.Ct. 1232; Note, 38 *La.L.Rev.* 239, 244 (1977).

misses the issue, however, with the comment that "'interrogation' is a relative term." If, by this, the majority means that "interrogation" is not limited to direct questioning, we would agree. In *Brewer*, the officer did not engage in direct questioning of the defendant. Knowing, however, that the defendant was of questionable mental capacity and of strong Christian faith, he made a very clever speech to the defendant about the shame of the small slain girl left out in the freezing cold without a decent "Christian burial" with the plain purpose of shaming him into revealing the whereabouts of the slain girl's body. That speech, the majority found, was "tantamount to interrogation"[5] or, as Justice Powell characterized it, was "a skillful and effective form of interrogation."[6] But presence, alone,[7] is not enough to constitute interrogation. Nor is listening interrogation. The mere "subjective desire to obtain information from a suspect after arraignment," if unaccompanied by some affirmative action, either direct or subtle, reasonably *calculated to induce conversation relative to the crime*, will not satisfy the requisite of "interrogation."[8] The officer or informer must stimulate, however, subtly, the incriminating conversation to satisfy the test of "interrogation."

The majority opinion makes little effort to qualify the action of the informer in this case as "interrogation" unless simply the "presence" of a paid informer is sufficient.[9] In any event, the conduct of the informer in this case would not so qualify. The informer Nichols was a state prisoner, serving a state sentence. He had formerly been a paid informer for the federal government but he had fallen afoul the state forgery laws and was at the time a state prisoner.

In late November, 1972, an FBI agent visited Nichols at the jail where he was imprisoned. Nichols told the agent there were a number of federal prisoners, including the defendant, in his cell block in the jail. The agent did not know that the defendant and Nichols were cellmates and he had nothing to do either with Nichols being in the same jail with the defendant or with the two being made cellmates. The agent told Nichols to be alert to any statements by the federal prisoners. He expressly instructed Nichols not to initiate any conversation with the federal prisoners, but, if they talked, to pay close attention to what they said. Nichols was merely to listen. In particular, Nichols was directed "not to question [the defendant] in regard to the bank robbery."

Some weeks later, after Nichols had completed his state sentence and had been released, the agent saw Nichols, who told him of the incriminating statements he heard the defendant make. There is no evidence that Nichols had in any way violated the instructions given him by the agent. The record indicates that the defendant's incriminating statements were voluntarily and spontaneously given without any encouragement from Nichols. And the District Judge so found. Under this finding, by which we are bound since it cannot be said to be clearly erroneous, there was no "interrogation" of the defendant by Nichols, however broadly that term may be defined.

The majority—I repeat—offers nothing to suggest that the statement of the defendant, testified to by Nichols, was secured as a result of "interrogation" beyond the ambiguous statement indicating that pres-

---

5.   430 U.S. at 400, 97 S.Ct. 1232.

6.   430 U.S. at 412, 97 S.Ct. at 1246.

7.   The suggestion that in *Massiah* the only action of the informer, inducing the confession by the defendant, was that he was simply present is rebutted by the citation in note 2 of the majority opinion, which quotes the language of the Court of Appeals in *Massiah*, 307 F.2d 62, 66 (2nd Cir. 1962) indicating "that the co-defendant had solicited information about the pending case." Actually, the informer in *Massiah* deliberately engaged Massiah in conversation for the sole purpose of eliciting incriminating statements in order that the police might monitor them on a hidden radio. 377 U.S. at 202–203, 84 S.Ct. 1199.

8.   430 U.S. at 440, 97 S.Ct. at 1200 (Blackmun, J., dissenting).

9.   *See* note 7, *supra*.

ence of an undisclosed informer-listener in the cell with the defendant satisfied "interrogation" under its definition of that term as merely "relative." This conclusion follows from the unique way in which the majority opinion proceeds to find "that there was interrogation within the meaning of *Brewer*." It predicated its crucial conclusion that there was interrogation by finding that "*by association, by general conversation*, or both, Henry developed *sufficient confidence in Nichols that Henry bared his incriminating secrets to an undisclosed paid informer*." (Italics added) In effect, what the majority is saying is that a defendant's voluntary incriminating admissions become the product of an interrogation, as that term is defined in *Brewer*, merely because the person who hears the voluntary admission is an "undisclosed paid informer" in whom the defendant "by association" has developed a "confidence" that the person will keep his secret.

The primary element of this definition of "interrogation" is apparently the "undisclosed" or "surreptitious" character of the government informer.[10] But *Brewer* made it quite plain that the whether the confession or damaging admission had been "elicited surreptitiously" was "constitutionally irrelevant."[11] And this is the way *Brewer* has been interpreted by all the commentators.[12] Moreover, it was so applied in the recent case of *United States v. Hearst* (9th Cir. 1977) 563 F.2d 1331, 1348, *cert. denied* 435 U.S. 100, 98 S.Ct. 1656, 56 L.Ed.2d 90.

If, on the other hand, the language of the majority opinion in its critical conclusion represents a general condemnation, on constitutional grounds, of the use of "undisclosed" undercover agents and informers, paid or unpaid, and the infiltration of such agents,—if their *"undisclosed"* character is the critical point in the majority opinion's holding of constitutional invalidity—it flies straight into the teeth of repeated decisions of the Supreme Court finding that the use of such undercover agents and informers presents no constitutional violation. The use of informers, whether voluntary or paid, has never been found to be reprehensible, or, to quote a leading case, "as a deprivation of due process of law based on the notion that such practice is 'unfair' or 'offend[s] those canons of decency and fairness which express [our] * * * notions of justice.' "[13] Indeed, in a case last year which originated in this Circuit, the Court spoke approvingly of "the value it [undercover policework] often is to effective law enforcement." *Weatherford v. Bursey* (1977) 429 U.S. 545, 557, 97 S.Ct. 837, 844, 51 L.Ed.2d 30. For other recent cases finding no constitutional taint attaching to undercover activities by the police, *see United States v. Russell* (1973) 411 U.S. 423, 432, 93 S.Ct. 1637, 36 L.Ed.2d 366 and *United States v. White* (1971) 401 U.S. 745, 752, 91 S.Ct. 1122, 28 L.Ed.2d 453. These authorities simply confirm the conclusion that the use of undercover agents, or "secret informers," does "not violate [the defendant's]

---

**10.** This seems to follow from the earlier statement in the majority opinion, based on an opinion dissenting from denial of certiorari in *Miller v. California* (1968) 392 U.S. 616, 88 S.Ct. 2258, 20 L.Ed.2d 1332, that "[a]n *undisclosed* government agent may effectively 'interrogate' a defendant by simply engaging the defendant in a general conversation * * *." (Emphasis added)

**11.** 430 U.S. at 400, 97 S.Ct. 1232.

**12.** *See*, Note, *The Right to Counsel: An Alternative to Miranda*, 38 *La.L.Rev.* 239, 244 (1977); Note, *The Right to Counsel and the Strict Waiver Standard*, 57 Neb. L.Rev. 543, 550 (1978).

The full quote in the *La.L.Rev.* is as follows: "While slight factual differences exist between the cases, [*Massiah* and *Brewer*] the

majority resolved the difficulties by stating that whether incriminating disclosures made in the absence of counsel were elicited openly or surreptitiously is constitutionally irrelevant in determining whether the right to counsel had been abridged."

And it was in support of this point that the plurality opinion cited *McLeod v. Ohio*, 381 U.S. 356, 85 S.Ct. 1556, 14 L.Ed.2d 682, and only to this point. 430 U.S. at 400, 97 S.Ct. 1232.

**13.** *United States v. Fioravanti* (3d Cir. 1969) 412 F.2d 407, 414, n.15, *cert. denied sub nom. Panaccione v. United States*, 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88, relying on *Hoffa v. United States*, 385 U.S. 293 at 310–311, 87 S.Ct. 408, 17 L.Ed.2d 374.

Fourth, Fifth or Sixth Amendment rights." [14]

If the heart of the crucial rule promulgated by the majority, however, is that the association as a cellmate creates such a feeling of "confidence [in a defendant]" as to induce him to "bare his incriminating secrets" to the undisclosed paid informer-cellmate as to make it a constitutional violation to admit into evidence other "incriminating secrets," it is effectively refuted by the ruling of the court in *Hoffa v. United States* (1966) 385 U.S. 293, 302, 87 S.Ct. 408, 413, 17 L.Ed.2d 374, that the Constitution affords no protection to "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it," even when that person is an "undisclosed informer." In that case, the informer had insinuated himself into the defendant's confidence by representing himself as a long-time friend and associate anxious to aid in the defendant's defense. This principle in *Hoffa* was followed in *Fioravanti*, in which an undercover agent infiltrated the criminal group, was arrested with the group, and while both the defendant and the undercover agent were "confined [together] in the bull pen," the defendant, who "thought that he was conversing with a fellow partner in crime, not a policeman," made incriminating statements.[15] The court had no hesitancy in finding the testimony of the undercover agent about the incriminating statements admissible in that case. And the ruling in that case is similar in many respects to our own case of *United States v. Dowdy* (4th Cir. 1973) 479 F.2d 213, 229–230, *cert. denied* 414 U.S. 823, 866, 94 S.Ct. 124, 38 L.Ed.2d 56, *reh. denied* 414 U.S. 1117, 94 S.Ct. 851, 38 L.Ed.2d 744. There the person engaged in a bribery scheme with the defendant turned into an FBI informer. As a result of his association in crime with the defendant, he had established a relationship under which the defendant felt he could talk freely with him without fear of repeti-

tion. We found no constitutional bar to the admission of the incriminating statements of the defendant. In *United States v. White* (1971) 401 U.S. 745, 751, 91 S.Ct. 1122, 1125, 28 L.Ed.2d 453, the incriminating statement was made to "a police agent who conceal[ed] his police connections," but no invalidity was found in the admission of the undisclosed "police agent's" statement.

In short, there is no case, so far as I can find, which makes any distinction on grounds of constitutional admissibility between incriminating statements testified to by secret informers and by private individuals. Not even the dissenting opinion in *Miller v. California*, which incidentally is the only authority cited by the majority opinion in support of its ruling, makes such a distinction. There is no reason to assume that an incriminating statement is any less reliable or trustworthy, if made to an undisclosed informer or undercover agent than if made to a private individual and there is no basis for treating the two situations differently for purposes of admissibility.

I submit that for the reasons given the basis upon which the majority opinion rests its conclusion is untenable, however it may be viewed, and is contrary to authority. As a matter of fact, there are two recent decisions which clearly cannot be reconciled with either the reasoning behind the majority opinion or the result reached in it. The first of these is *United States v. Hearst, supra*, 563 F.2d 1331. In *Hearst*, the conversation of the defendant with a prison visitor, unknown to her, was monitored and recorded "surreptitiously" by the prison authorities. This was done because of the jail's policy of monitoring conversations in "very publicized cases or high security problems." [16] The Court emphasized that there was no evidence the visitor had "engaged [the defendant] in the conversation later used against her." The defendant, however, argued that the "deliberate, secret

---

14. *United States v. Fioravanti, supra*, at 413, n.15, 412 F.2d.

15. 412 F.2d at pp. 409 and 413.

16. 563 F.2d at 1344.

listening" [17]—that is, the "surreptitiously obtaining"—without the presence of counsel violated the defendant's Sixth Amendment rights as established by *Massiah*. In effect, the situation was analogous factually to this case and the position taken by the defendant in that case was similar to that taken by the defendant here. The Court, however, dismissed the claim, stating at p. 1348:

"The Supreme Court in *Brewer v. Williams*, * * * recently interpreted *Massiah* in a manner directly opposed to appellant's contention. In *Brewer*, the Court stated in unambiguous terms that 'no such constitutional protection [of the right to assistance of counsel at the time the defendant made the incriminatory statements] would have come into play if there had been no interrogation.' * * * Relevant to appellant's argument that by secretly listening to incriminating statements the government violated the rights defined in *Massiah*, the Court stated: 'That the incriminating statements were elicited surreptitiously in the *Massiah* case, and otherwise here, is constitutionally irrelevant . . . Rather, the clear rule of *Massiah* is that once adversary proceedings have commenced against an individual, he has a right to legal representation *when the government interrogates him.*' * * * (emphasis added; citations omitted). Thus, under *Massiah*, as interpreted by *Brewer*, there was no violation of appellant's Sixth Amendment right to the assistance of counsel because there was no interrogation of her—either formally or surreptitiously—by the government." (citations omitted)

There is no way to distinguish *Hearst* from this case. The challenged statements were procured secretly and surreptitiously in both cases. In neither case had there been "interrogation," as that term was used in *Brewer* and *Massiah*. Neither Nichols in this case nor Tobin in *Hearst* had engaged the defendant in conversation. It has been suggested that there may be a difference between a *paid* informer reporting a face-to-face admission and testimony from a *paid* government employee who surreptitiously, through the use of electronic surveillance, secures the incriminating information and that such difference distinguishes this case from *Hearst*. *Wilson v. Henderson* (2d Cir. 1978) 584 F.2d 1185, 1191, however, gave what appears to me to be the conclusive answer to this suggestion:

"Furthermore, the admission of an in-custody statement voluntarily made to an informant seems less egregious than the use of a statement intercepted by an electronic eavesdropping device as was upheld in *United States v. Hearst*, * * *. When a defendant makes a completely unsolicited, incriminating remark in a face-to-face encounter with an informant, he knowingly assumes the risk that his confidant may ultimately prove to be untrustworthy. In an illegal search and seizure case the Supreme Court stated:

" '[n]either this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.

*Hoffa v. United States*, 385 U.S. 293, 302, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).' "

*Wilson v. Henderson* is even more directly in point. In that case the defendant's cellmate agreed "to act as an informant." He was "instructed not to inquire or question, but to keep his ears open for information * * *. The circumstances under which the incriminating statement of the defendant was made are thus described in the opinion:

"Initially, Wilson (the defendant) repeated to Lee (the cellmate-informer) the same version of the facts that he had related to Cullen (the investigatory officer). Lee's only comment was that the story did not sound too good. By the end of the third day, Wilson made an auricu-

---

17. 563 F.2d at 1347.

lar confession to complicity in the robbery and murder." [18]

The defendant claimed that this incriminating statement "was improperly admitted at trial in violation of his Sixth Amendment right to counsel under *Massiah v. United States*, * * * ." [19] It is evident that factually this case is on all-fours with our case and that the legal issue is precisely the same. In that case, the Court held, contrary to the majority opinion in this case, that "where Lee did not interrogate Wilson, nor in any way attempt to deliberately elicit incriminating remarks, the rule of *Massiah* [had] not been transgressed." [20] With particular reference to the informer's presence as a cellmate, the Court said (p. 1191):

"Nor is the fact that the informant was placed in Wilson's cell under surreptitious circumstances a distinguishing point in this case. This court has repeatedly held that a defendant's voluntary, incriminating statements made to a person known by the defendant to be a government officer are properly admissible under *Massiah*. *United States v. Garcia*, [377 F.2d 321 (2nd Cir.)]; *United States v. Gaynor*, 472 F.2d 899 (2nd Cir. 1973); *United States v. Barone*, 467 F.2d 247 (2nd Cir. 1972); *United States v. Maxwell*, 383 F.2d 437 (2nd Cir. 1972) cert. denied 389 U.S. 1043, 88 S.Ct. 786, 19 L.Ed.2d 835 (1968); *United States v. Accardi*, 342 F.2d 697 (2nd Cir. 1965) cert. denied 382 U.S. 954, 86 S.Ct. 426, 15 L.Ed.2d 359 (1965). Ostensibly, comparable statements made to undercover agents should receive similar treatment because the fact that an incriminating statement is received surreptitiously or otherwise is constitutionally irrelevant. *Brewer v. Williams*, 430 U.S. at 400, 97 S.Ct. 1232."

Certainly, there can be no distinction drawn between this case and *Wilson*. In fact, if anything, the facts in that case were more favorable to the defendant's claim than are the facts in this case. Here, the government agent knew only that Nichols was in the same prison unit as the defendant but, unlike the officer in *Wilson*, he did not know that the defendant and Nichols were cellmates. In *Wilson* it seems the informer was actually placed in the cell with the defendant with the knowledge, if not at the instance, of the investigating officer. That is not true in this case.

The Court in *Wilson* declared that the conduct of the government in that case was not "the type of reprehensible police behavior which the courts feel compelled to discourage. The instructions to Lee suggest a conscious effort on Cullen's part to guard Wilson's constitutional rights while pursuing a crucial homicide investigation. His directions, 'Don't ask questions; just keep your ears open,' suggest familiarity and attempted compliance with, not circumvention of, the principle of *Massiah*. Under these circumstances, exclusion of Wilson's confession to Lee would serve no useful purpose. Accordingly, we are of the opinion that there was no infringement of Wilson's Sixth Amendment right to the assistance of counsel." [21] That is precisely this case and I suggest we should express the same view here as did the Court in *Wilson*.

In sum, I think *Brewer* plainly declares that without interrogation there is no violation of *Massiah*. This is the construction given *Brewer* in all the comments on that case; it is the construction given it by two Circuit Courts of Appeals. The only authority cited by the majority opinion in contradiction is a dissenting opinion filed years before *Brewer*, written by one of the dissenters in *Brewer*. Without the slightest evidence of any interrogation of the defendant by Nichols in connection with this crime, the majority finds interrogation merely by the presence of the informer in the cell with the defendant. Presence, *whether surreptitious or not*, does not constitute interrogation within *Brewer*. I dissent.

**18.** P. 1187.

**19.** P. 1189.

**20.** P. 1191.

**21.** P. 1191.