742 F.2d 741
 Joseph Allan WILSON, Petitioner-Appellant,
v.
Hon. Robert J. HENDERSON, Superintendent, Auburn
Correctional Facility, Respondent-Appellee.
 No. 1054, Docket 83-2113.
 United States Court of Appeals,
Second Circuit.
 Argued April 5, 1984.
Decided Aug. 27, 1984.
 
 Ida C. Wurczinger, New York City (Philip S. Weber, New York City, of counsel), for petitioner-appellant.
 Jeremy Gutman, Asst. Dist. Atty., New York City (Mario Merola, Dist. Atty., Steven R. Kartagener, Asst. Dist. Atty., New York City, of counsel), for respondent-appellee.
 Before TIMBERS, VAN GRAAFEILAND and CARDAMONE, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 This appeal is from an order that denied habeas corpus relief. Reversing that order and granting petitioner his habeas remedy emphasizes not that a court likes or thinks it wise to reverse a conviction, but rather that a conviction obtained by means that offend constitutional principles may not stand. Here the State's use of a jailhouse informant placed in petitioner's cell by prearrangement to elicit inculpatory information violated his Sixth Amendment right to counsel.
 
 
 2
 Petitioner Joseph Allan Wilson appeals from a decision of the United States District Court for the Southern District of New York (Gagliardi, J.) that denied his application for a writ of habeas corpus pursuant to 28 U.S.C. Sec. 2254. Although appellant has been before us on a previous application, Wilson v. Henderson, 584 F.2d 1185 (2d Cir.1978), rehearing denied, 590 F.2d 408 (2d Cir.), cert. denied, 442 U.S. 945, 99 S.Ct. 2892, 61 L.Ed.2d 316 (1979), the circumstances of this case require some reiteration of the facts giving rise to his present application.
 
 
 3
 * On July 4, 1970 three individuals committed an armed robbery of the Star Taxicab Garage during which the on duty dispatcher was shot and killed. Three employees identified Wilson as being present on the Star premises. Aware that the police were looking for him, Wilson voluntarily surrendered himself on July 8 and was promptly arrested. After receiving his Miranda warnings, he admitted to Detective Cullen that while looking for his brother on the day in question, he came upon the scene of the crime and witnessed the robbery. Wilson told the detective that he had not been personally involved and fled only because he was afraid of being blamed. Counsel was subsequently assigned him, and he was arraigned on July 9.
 
 
 4
 Sent to the Bronx House of Detention following his arraignment, Wilson was later moved to a cell that overlooked the Star garage. His cellmate, a prisoner named Benny Lee, had previously agreed to act as an informant. Detective Cullen had instructed Lee to listen "to see if [he] could find out" the identity of the other two perpetrators, but not to "question the man in any way." Immediately upon entering the cell Wilson expressed dismay over the view--"somebody's messing with me because this is the place I'm accused of robbing"--and began to talk to Lee about the robbery. He told Lee that he had seen the robbers commit the crime and picked up some of the money they dropped. Lee commented that Wilson had better come up with a more convincing story.
 
 
 5
 Wilson subsequently was visited by his brother and learned at that time how upset his family was over the killing. Wilson again became agitated and, when he next spoke to Lee, changed his story. This time appellant admitted that he and his two cohorts had in fact executed the robbery according to plan over the holiday weekend when they knew there would be a lot of money in the garage, and that the victim was shot during the robbery. Lee later reported Wilson's inculpatory statement to Detective Cullen, and gave him pages of secret notations made during his conversations with Wilson.
 
 
 6
 Subsequently indicted and charged with murder and felonious possession of a weapon, appellant moved to suppress his statements to Lee. Following a Huntley[1] hearing, the state trial court found that Lee did not "interrogate" Wilson, but only listened and made notes. It therefore denied Wilson's motion, concluding that his statements were voluntary and unsolicited. At Wilson's state court trial, the proof of guilt was nearly overwhelming and appellant was convicted by a jury for both crimes. Appeals to New York's intermediate and highest court were unavailing.
 
 
 7
 After this journey through the New York state courts, Wilson filed a petition for a writ of habeas corpus in the United States District Court, claiming that the admission of Lee's statements violated his constitutional rights. Relying on Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the district court rejected this claim, finding that the record did not show any formal interrogation by the undercover agent but only spontaneous statements by Wilson. As noted, we affirmed the district court and refused to grant a rehearing. Certiorari was denied in 1979.
 
 
 8
 A year later the Supreme Court handed down its decision in United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) (Henry ). In September 1981 appellant filed a motion in state court to vacate his conviction, arguing that the admission of his statements to Lee was unconstitutional in light of Henry. In denying the motion the state court distinguished Henry on the ground that in that case Henry's cellmate was a paid government agent. The state judge also concluded that Henry was not to be applied retroactively. In January 1982 the Appellate Division denied Wilson's application for leave to appeal.
 
 
 9
 Having exhausted his state court remedies, Wilson filed a second petition for a writ of habeas corpus in the district court, specifically alleging that his right to counsel had been violated under Henry and that Henry should be applied retroactively. The district court, relying in part on the record of the state court hearing, concluded that Wilson had not been interrogated and that his statements to Lee were spontaneous. On appeal, Wilson argues that the district court erred both in concluding that there was no "deliberate elicitation" of incriminating statements within the meaning of Massiah and Henry, and in deferring to the state court's findings on this issue. Wilson also maintains that Henry formulated a constitutional rule governing an accused's right to counsel and urges us to apply Henry retroactively. The State contends that the legal principles articulated in Henry are no different from those we applied on Wilson's first habeas appeal, and that the ends of justice would not be served by reconsidering the merits of Wilson's petition, even were Henry not distinguishable.
 
 II
 
 10
 It is well settled that courts may give controlling weight to a denial of a prior application for habeas corpus only if "(1) the same ground presented in the subsequent application was determined adversely to the applicant on the prior application, (2) the prior determination was on the merits, and (3) the ends of justice would not be served by reaching the merits of the subsequent application." Sanders v. United States, 373 U.S. 1, 15, 83 S.Ct. 1068, 1077, 10 L.Ed.2d 148 (1963); United States ex rel. Schnitzler v. Follette, 406 F.2d 319, 321 (2d Cir.), cert. denied, 395 U.S. 926, 89 S.Ct. 1783, 23 L.Ed.2d 244 (1969).
 
 
 11
 The State urges that there must be an end to litigation on Wilson's claim. This argument will hardly halt the inexorable rising and falling of the legal tides. A look at the long and tortured history of Henry itself as it also slowly wended its way through the court system until its final resolution in the Supreme Court amply answers the State's argument. The doctrine of res judicata is generally inapplicable to habeas proceedings. Smith v. Yeager, 393 U.S. 122, 124-25, 89 S.Ct. 277, 278-79, 21 L.Ed.2d 246 (1968) (per curiam); Salinger v. Loisel, 265 U.S. 224, 230, 44 S.Ct. 519, 521, 68 L.Ed. 989 (1924). Moreover, we note that conventional notions of finality in criminal litigation are of no weight where life or liberty is at stake and infringement of constitutional rights is alleged. Sanders v. United States, supra, 373 U.S. at 8, 83 S.Ct. at 1073; see Davis v. United States, 417 U.S. 333, 342, 94 S.Ct. 2298, 2303, 41 L.Ed.2d 109 (1974); Kaufman v. United States, 394 U.S. 217, 228, 89 S.Ct. 1068, 1075, 22 L.Ed.2d 227 (1969). Thus, notwithstanding that in his earlier petition Wilson advanced substantially the same ground for relief that he now advances, we conclude that the "ends of justice" require a consideration of the merits of his present application.III
 
 
 12
 We turn first to United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115. There the defendant was indicted in 1972 for armed robbery and held pending trial in a city jail. Government agents contacted Nichols, an inmate serving a sentence for forgery, who had previously served as a paid informant for the Federal Bureau of Investigation. Nichols advised the agents that he was housed in the same cellblock with several federal prisoners awaiting trial, including Henry. Nichols was told to be alert to any statements made by the prisoners, but not to initiate any conversation with or question Henry regarding the robbery. The informant later reported that he engaged in a conversation with Henry during which Henry told him about the robbery. Nichols was paid for this information. Henry's inculpatory statements were used against him at trial and led to his conviction, which was summarily affirmed, 483 F.2d 1401 (4th Cir.1973), and his petition for certiorari was denied, 421 U.S. 915, 95 S.Ct. 1575, 43 L.Ed.2d 781 (1975).
 
 
 13
 When Henry moved to vacate his conviction pursuant to 28 U.S.C. Sec. 2255, he claimed that Nichols' testimony violated his Sixth Amendment right to counsel, inasmuch as a paid informant had been intentionally placed in his cell to secure information about the robbery. The district court summarily denied Henry's Sec. 2255 motion, but the Court of Appeals for the Fourth Circuit reversed and remanded for an evidentiary hearing. The district court's second denial of the Sec. 2255 motion was again reversed on appeal. The Fourth Circuit held that the government's actions impaired Henry's Sixth Amendment rights under Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Henry v. United States, 590 F.2d 544 (4th Cir.1978). After noting that Nichols had engaged in conversations with Henry, the court of appeals concluded that if by association, general conversation, or both, Henry developed sufficient confidence in Nichols to bare his incriminating secrets, this constituted interference with his right to the assistance of counsel. 590 F.2d at 547.
 
 
 14
 On appeal the Supreme Court affirmed that decision. United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115. The issue was whether a government agent "deliberately elicited" incriminating statements from the defendant within the meaning of Massiah. Id. at 270, 100 S.Ct. at 2186. In considering that issue the Supreme Court viewed three factors as important: first, that Nichols was acting under instructions as a paid informant; second, that ostensibly he was no more than a fellow inmate of Henry; and third, that Henry was in custody and under indictment at the time he was engaged in conversation by Nichols. Id. The Court accepted the circuit court's determination that held Nichols' conduct attributable to the government, based in large part on the Government's awareness that Nichols had access to Henry and would be able to engage him in conversations without arousing his suspicions. In rejecting the government's argument that the agents had instructed Nichols not to question Henry about the robbery, the Supreme Court noted that Nichols was not a purely passive listener but had in fact engaged in some conversations with Henry which resulted in Henry's making the inculpatory statements. Id. at 271, 100 S.Ct. at 2187. In this connection the Court specifically stated that it was not passing upon a situation where an informant, although placed in close proximity to the accused, made no effort to stimulate conversations about the crime charged. Id. at 271 n. 9, 100 S.Ct. at 2187 n. 9. Thus, the high Court concluded that "[b]y intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel." Id. at 274, 100 S.Ct. at 2189.
 
 
 15
 When comparing Henry to the present case, the district court recognized that Wilson's cellmate was surreptitiously acting as a government agent, but concluded that the record established that Wilson's statements were spontaneous and not elicited by Lee. Since the court thought that this case presented the precise fact pattern on which the Henry court had expressly reserved in footnote 9, the judge therefore found the instant case distinguishable. We disagree. A comparison of this case and Henry reveal three significant similarities: (1) as in Henry, here the informant Lee was surreptitiously acting as a government agent, while ostensibly no more than a fellow inmate of Wilson; (2) Wilson made the inculpatory statements after his Sixth Amendment rights had attached;[2] (3) in Henry, the government created a situation that in fact induced the defendant to make incriminating statements. The factors considered and given weight by the Henry Court are also present here. In both cases, the informant "had 'some conversations with' [the defendant] while he was in jail and [the defendant's] incriminatory statements were 'the product of [these] conversation[s].' " Henry, 447 U.S. at 271, 100 S.Ct. at 2187. This third factor deserves more detailed discussion.
 
 
 16
 Here, after Lee was summoned by Detective Cullen, he was shown a picture of Wilson. Lee asked whether he could do anything to help with the case. After agreeing to cooperate, Lee was told that Wilson was soon going to be arrested and placed in Lee's cell. He was directed to find out as much information from Wilson as he could without asking questions. The fact that the government moved Wilson into a cell overlooking the Star Taxicab Garage--the scene of the crime--achieved the desired effect. As soon as Wilson arrived and viewed the garage, he became upset and stated that "someone's messing with me." The catalytic effect of being placed into this "room with a view" thus gave rise to expressed uneasiness on Wilson's part. Even accepting that Lee did not ask Wilson any direct questions, he effectively deflated Wilson's exculpatory version of his connection to the robbery scene by remarking that the story did not "sound too good" and that he had better come up with a better one. Subtly and slowly, but surely, Lee's ongoing verbal intercourse with Wilson served to exacerbate Wilson's already troubled state of mind. Lee testified that after several days and nights together, Wilson's version of the events surrounding the robbery changed "in bits and pieces." During this same time, Lee furtively made notes of his conversations with Wilson, which he later handed over to the police.
 
 
 17
 Thus, upon comparison, the district court erred in holding that this case came within the Henry footnote. The instant case cannot be held to be equivalent to one where an informant merely sits back and makes no effort to stimulate conversations with the suspect about the crime charged. Henry, 447 U.S. at 271 n. 9, 100 S.Ct. at 2187 n. 9. In fact, we conclude that Henry is indistinguishable from the present case. See Henry, 447 U.S. at 281, 100 S.Ct. at 2192 (Blackmun, J., dissenting) (citing Wilson ); Henry v. United States, 590 F.2d 544, 553 (4th Cir.1978) (Russell, J., dissenting) ("Certainly, there can be no distinction drawn between this case and Wilson. In fact, if anything, the facts in that case were more favorable to the defendant's claim than are the facts in this case."); Wilson v. Henderson, 590 F.2d 408, 409 (2d Cir.1979) (Oakes, J., dissenting) (noting Henry decision in Fourth Circuit to be "directly contrary" to our case); see also United States v. Sampol, 636 F.2d 621, 637-38 (D.C.Cir.1980) (noting allegations that the circumstances of Wilson and Henry were "virtually identical"). Since the government intentionally staged the scene that induced Wilson to make the inculpatory statements, it may be held to have deliberately elicited them in violation of Wilson's Sixth Amendment right to counsel.IV
 
 
 18
 Judicial decisions ordinarily apply retroactively. Robinson v. Neil, 409 U.S. 505, 507-08, 93 S.Ct. 876, 877, 35 L.Ed.2d 29 (1973). Before Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), the Supreme Court had recognized a general rule of retroactive effect for its constitutional decisions based largely upon Blackstone's notion "that the duty of the court was not to 'pronounce a new law, but to maintain and expound the old one.' " Id. at 622-23, 85 S.Ct. at 1734 (quoting 1 W. Blackstone, Commentaries 69 (15th ed. 1809)). Consequently, a legal system based on precedent had a built-in presumption of retroactivity. Yet, in Linkletter, the Court refused to give that effect to Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Instead, the Supreme Court applied its holding in Mapp only to those defendants whose convictions were not then final. It wrote that "the Constitution neither prohibits nor requires retrospective effect" be given to any "new" constitutional rule, Linkletter v. Walker, supra, 381 U.S. at 629, 628, 85 S.Ct. at 1737, and it recognized that the interests of justice and the exigencies of the situation may argue against imposing a "new" constitutional decision retroactively. See id. at 628, 85 S.Ct. at 1737.
 
 
 19
 On the other hand, when a Supreme Court decision does not espouse a "new" rule but simply applies settled precedents to new and different fact situations, no real question arises as to whether the later decision should apply retroactively. United States v. Johnson, 457 U.S. 537, 549, 102 S.Ct. 2579, 2587, 73 L.Ed.2d 202 (1982). In these cases "it has been a foregone conclusion that the rule of the later case applies in earlier cases, because the later decision has not in fact altered that rule in any material way." Id. (citing Dunaway v. New York, 442 U.S. 200, 206, 99 S.Ct. 2248, 2253, 60 L.Ed.2d 824 (1979) (reviewing application of the rule in Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)); Spinelli v. United States, 393 U.S. 410, 412, 89 S.Ct. 584, 586, 21 L.Ed.2d 637 (1969) ("further explicat[ing]" the principles of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964)); Desist v. United States, 394 U.S. 244, 263, 89 S.Ct. 1030, 1041, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting)).
 
 
 20
 In determining whether Henry established a "new" rule of law or merely applied settled precedent to a new factual situation, we first take cognizance of the very words used by the Henry court in framing the issue for decision:
 
 
 21
 The question here is whether under the facts of this case a Government agent "deliberately elicited" incriminating statements from Henry within the meaning of Massiah.
 
 
 22
 Henry, 447 U.S. at 270, 100 S.Ct. at 2186. Certainly the above quoted language does not purport to do anything more than apply the Massiah test for deliberate elicitation to the Henry facts. The Henry opinion reaffirmed the application of the "deliberately elicited" test by pointing out that when an accused is in the company of a fellow inmate who, by prearrangement, acts as a government agent, the conversations can serve to elicit information that an accused would not otherwise intentionally reveal to persons known to be government agents. See id. at 273, 100 S.Ct. at 2188. In rejecting the government's argument that a less rigorous standard should apply where the accused is prompted by an undisclosed undercover informant rather than by a known government agent, the Court again pointed directly to Massiah which stated "that if the Sixth Amendment 'is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted [overtly] in the jailhouse.' " Id. at 273, 100 S.Ct. at 2188 (quoting Massiah v. United States, supra, 377 U.S. at 206, 84 S.Ct. at 1203). Both the Henry and the Massiah courts noted that defendants were more seriously imposed upon when they did not know that the informant was a government agent. Henry, 447 U.S. at 273, 100 S.Ct. at 2188; Massiah v. United States, supra, 377 U.S. at 206, 84 S.Ct. at 1203.
 
 
 23
 The Henry court continued stating that "[b]y intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel." Henry, 447 U.S. at 274, 100 S.Ct. at 2189 (footnote omitted). While the import of this statement has been questioned, see, e.g., United States v. Bagley, 641 F.2d 1235, 1238 n. 3 (9th Cir.1981) ("The extent to which Henry has modified Massiah, if at all, is not entirely clear"), we believe that Henry merely applied the "deliberately elicited" test of Massiah to new facts, and we reject a reading of Henry as establishing a "likely to induce" test that fundamentally restructures Massiah.[3]
 
 
 24
 Further support for the conclusion that Henry did not establish a "new" constitutional rule is found from the fact that there has been no explanatory statement by the Supreme Court whether and to what extent such a purported new rule applies to past, pending and future cases. See, e.g., Solem v. Stumes, --- U.S. ----, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984) (holding that Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) should not be applied retroactively); United States v. Johnson, supra, 457 U.S. at 542, 102 S.Ct. at 2583 (holding that Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), applied retroactively to all convictions not yet final); Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971) (holding Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) not to be retroactive); Desist v. United States, 394 U.S. 244, 248, 89 S.Ct. 1030, 1032, 22 L.Ed.2d 248 (1969) ("However clearly our holding in Katz [v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ] may have been foreshadowed, it was a clear break with the past, and we are thus compelled to decide whether its application should be limited to the future."). See generally Beytagh, Ten Years of Non-Retroactivity: A Critique and a Proposal, 61 Va.L.Rev. 1557 (1975). More specifically, for our purposes, the habeas petitioner was granted relief in Henry without reference to the three part test of Stovall v. Denno, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967). Since the Stovall analysis is employed as a matter of course to determine whether a new rule should be retroactive, the failure to discuss the Stovall test indicates that the Supreme Court in Henry did not intend to create a "new" rule, but was merely applying the Massiah rule to new facts.
 
 
 25
 Having decided that the principles of Henry are fully applicable to the instant case, we hasten to point out that the courts considering this matter earlier did not have the benefit of the Henry decision as we now do. Without it, the prior panel relying on Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), concluded that the "deliberate elicitation" standard required evidence of "interrogation" as a prerequisite. Since the state trial judge found that there had been no "interrogation" of Wilson by his cellmate, the panel concluded that this negated the proposition that Wilson's statements were "deliberately elicit[ed]." Wilson v. Henderson, supra, 584 F.2d at 1190-91; but see id. at 1195 (Oakes, J. dissenting) (in finding a Massiah violation, "what is critical is whether police conduct 'deliberately elicited' information, not the precise manner in which the statements were obtained."). In Henry the Supreme Court rejected such a proposition, writing that Brewer never modified Massiah's "deliberately elicited" test. It specifically noted that "[i]n Massiah, no inquiry was made as to whether Massiah or his codefendant first raised the subject of the crime under investigation," Henry, 447 U.S. at 271-72, 100 S.Ct. at 2187, and went on to state that "[i]n both Massiah and this case, the informant was charged with the task of obtaining information from an accused." id. at 272 n. 10, 100 S.Ct. at 2187 n. 10. It concluded by observing that "[w]hether Massiah's codefendant questioned Massiah about the crime or merely engaged in general conversation about it was a matter of no concern to the Massiah Court," and deemed "irrelevant" the fact that in Massiah the agent had to arrange the meeting while in Henry the agents were fortunate to have an undercover informant already in close proximity to the defendant. Id.
 
 
 26
 The earlier panel also found no distinction between incriminating statements voluntarily made by a defendant to a known government officer and statements made to an undercover agent acting surreptitiously, likening the latter situation to a knowing assumption of the risk by the defendant that his confidant would ultimately prove untrustworthy. Wilson v. Henderson, supra, 584 F.2d at 1191. Looking again to Massiah, Henry substantially distinguished these two situations. Where an accused speaks to a known government agent, he would typically be aware that his statements could be used against him, and as a result, the two parties could be termed " 'arm's-length' adversaries." Henry, 447 U.S. at 273, 100 S.Ct. at 2188. The same could not be said where the accused was in the company of a fellow inmate who quite unknown to the accused was acting as a police agent. In that situation, where the accused's guard was down, he might well confide in the informer who was subtly interrogating him. In that case, the concept of a knowing and voluntary waiver of Sixth Amendment rights is inapplicable. Id. (citing Massiah v. United States, supra, 377 U.S. at 206, 84 S.Ct. at 1203).
 
 V
 
 27
 The State's use of a jailhouse informant to elicit inculpatory information from Wilson controvened his right to counsel under circumstances similar to those condemned in Henry and Massiah. Accordingly, the decision of the district court denying Wilson's application for habeas relief is reversed, and this case is remanded with instructions to grant Wilson's application and to direct his release unless the State elects to retry him.
 
 VAN GRAAFEILAND, Circuit Judge, dissenting:
 
 28
 On July 4, 1970, at approximately 3:30 a.m., two witnesses saw appellant leave the Star Maintenance Cab garage in the Bronx with a quantity of money cradled in his arms. "Keep cool", appellant said as he fled the garage, "I've left something on the floor for you."
 
 
 29
 That "something" was the body of Samuel Reiner, the night dispatcher, who had been shot and killed during the course of a robbery.
 
 
 30
 In what could only be termed an understatement, my colleagues say that proof of appellant's guilt was "nearly overwhelming." The fact is that the police had appellant dead to rights. Although appellant neither confessed nor testified, he admitted to the police that he was at the scene of the crime with two other men and that he ran away with them as they fled the scene with money in their hands.
 
 
 31
 What the police did not know but wanted to learn was the identity of the other two participants in the crime. It is undisputed that Detective Cullen enlisted the aid of Benny Lee for this sole purpose. Detective Cullen told Lee that he knew appellant was one of the perpetrators. According to Lee, Cullen "didn't want me to ask questions or question the man in any way, just to sit there and to listen to him and to see if I could find out the names of the other two men who were involved." Despite this evidence which is uncontradicted, my colleagues now find that Lee was placed in appellant's cell "to elicit inculpatory information", that Lee was "subtly interrogating" appellant, and that the government "deliberately elicited the inculpatory statements" which appellant made. As in Sumner v. Mata, 449 U.S. 539, 548-49, 101 S.Ct. 764, 769-70, 66 L.Ed.2d 722 (1981), these findings are contrary to those of every court that heretofore has considered this case.
 
 
 32
 Following a Huntley hearing, the State court found that Lee followed the instructions given him by Detective Cullen and conducted no interrogation of appellant during the time they were cellmates. The court also found "beyond a reasonable doubt that the utterances made by defendant to Lee were unsolicited, and voluntarily made." Appellant's challenge to these findings was rejected without opinion by the Appellate Division, First Department. 41 A.D.2d 903, 343 N.Y.S.2d 563 (1st Dep't 1973).
 
 
 33
 In denying appellant's first petition for habeas corpus, District Judge Robert Carter stated:
 
 
 34
 The record indicates that there was no interrogation whatsoever by the undercover agent only spontaneous statements offered by petitioner.
 
 
 35
 District Judge William Mehrtens, sitting by designation on this Court and writing the majority opinion for affirmance, 584 F.2d 1185 (1978), stated that
 
 
 36
 Lee did not make any effort to interrogate Wilson, nor was he placed in the cell for that purpose....
 
 
 37
 Thus, the purpose of the investigation, i.e., furtively attempting to uncover the identity of the other two perpetrators, cannot be censured.
 
 
 38
 Id. at 1191.
 
 
 39
 Finally, District Judge Lee Gagliardi, whose decision is being reversed, found that the "record plainly establishes that petitioner's incriminating statements were spontaneous and were not elicited in any way by the government informant." Judge Gagliardi also found that the State court findings were "fully supported by the record."
 
 
 40
 Although in reviewing Judge Gagliardi's findings this Court is not bound by the clearly erroneous standard of review, Taylor v. Lombard, 606 F.2d 371, 372 (2d Cir.1979), cert. denied, 445 U.S. 946, 100 S.Ct. 1346, 63 L.Ed.2d 781 (1980), the burden nonetheless remains on appellant to establish by convincing evidence that the State court's factual determinations following the Huntley hearing were erroneous, United States ex rel. Stambridge v. Zelker, 514 F.2d 45, 51 (2d Cir.), cert. denied, 423 U.S. 872, 96 S.Ct. 138, 46 L.Ed.2d 102 (1975). We cannot dispense with the presumption that the State court's factual findings are correct, 28 U.S.C. Sec. 2254(d), without an adequate explanation as to why the findings are not fairly supported by the record. Sumner v. Mata, supra, 449 U.S. at 548-52, 101 S.Ct. at 769-71.
 
 
 41
 Because this Court, in affirming the rejection of appellant's prior habeas corpus application in which he advanced the same arguments that he asserts herein, made findings fully in accord with those of the State court, the need for such an explanation is even more imperative. A boilerplate statement that the "ends of justice" justify reconsideration on the merits, see Sanders v. United States, 373 U.S. 1, 12, 83 S.Ct. 1068, 1075, 10 L.Ed.2d 148 (1963), does not warrant rejection of all that has gone on before. See Sperling v. United States, 692 F.2d 223, 225-26 (2d Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983); Alessi v. United States, 653 F.2d 66, 68-69 (2d Cir.1981). My colleagues concede that proof of appellant's guilt was "nearly overwhelming", and they point to no change in the law which has transformed conduct that we formerly held to be constitutional into conduct that is now unconstitutional. See Sperling v. United States, supra, 692 F.2d at 226. The judges who voted against en banc review of our prior order of affirmance, 590 F.2d 408, were fully familiar with the Fourth Circuit's opinion in Henry v. United States, 590 F.2d 544 (4th Cir.1978), which subsequently was affirmed by the Supreme Court, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). The majority opinion does not disclose why, absent a change in the law, the "ends of justice" require reversal on this appeal when they did not require it on the prior appeal.
 
 
 42
 In short, because my colleagues have failed to demonstrate that the many judges who previously have rejected appellant's contentions erred in so doing, and have relied solely on a talismanic reference to the "ends of justice" in getting around both the provisions of section 2254(d) and the limitations on repetitive habeas corpus applications laid down in Sperling v. United States, supra, and Alessi v. United States, supra, I dissent.
 
 
 
 [1]
 People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965)
 
 
 [2]
 It is of no moment that Henry had been indicted while Wilson had only been arraigned at the time he engaged in conversation with Lee since Wilson's Sixth Amendment right to counsel attached at the time adversary judicial proceedings were initiated against him. See Estelle v. Smith, 451 U.S. 454, 469-70, 101 S.Ct. 1866, 1876, 68 L.Ed.2d 359 (1981); Brewer v. Williams, 430 U.S. 387, 398-99, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977)
 
 
 [3]
 Having so concluded, we need not address the Linkletter/Stovall factors governing the retroactive application of a "new" constitutional decision. See Linkletter v. Walker, 381 U.S. 618, 636, 85 S.Ct. 1731, 1741, 14 L.Ed.2d 601 (1965) and Stovall v. Denno, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967)